CZEIZLER *v.* RADKE.

1. APPEAL AND ERROR—CHANCERY CASE—DE NOVO REVIEW—SPE-
CIFIC PERFORMANCE.

A suit for specific performance of a land contract is reviewed
*de novo* by the Supreme Court since it is a chancery case.

2. SPECIFIC PERFORMANCE—JURISDICTION.

The jurisdiction of equity to decree specific performance pre-
supposes that the parties have agreed between themselves upon
every material matter and that the matters so agreed upon
are of such a nature and the subjects of enforcement are such
that the court can collect all elements in their proper relations
and proceed intelligently and practically in carrying into execu-
tion the very things agreed on and standing to be performed.

3. SAME—ENFORCEMENT ACCORDING TO TERMS.

Equity cannot make a new contract for the parties nor supply
any material stipulation thereof but must specifically enforce
the contract according to its terms or not at all.

4. SAME—PLAINTIFF'S COURSE OF CONDUCT.

Equitable relief by way of specific performance should not be
granted to plaintiff unless his course of conduct relative to the
transaction has been one that warrants the approval of a court
of equity.

5. SAME—REMEDY OF GRACE.

Specific performance is a remedy of grace and not a matter of
right and the test of whether or not it should be granted de-
pends upon the peculiar circumstances of each case.

6. SAME—DISCRETION OF COURT.

The granting of the remedy of specific performance lies within
the discretion of the court.

7. SAME—MUTUALITY OF OBLIGATION AND REMEDY.

Generally speaking, equity will decree the specific performance
of a contract only in cases where there is a mutuality of ob-
ligation and of remedy.

---

· Specific performance of land contract—mistake or sharp practice
as grounds for refusing, see 2 Restatement, Contracts, § 367, comment
c; uncertain terms, see § 370; remedy as affected by mutuality of
remedy, see § 372.

8. SAME—LAND CONTRACT—CONSIDERATION.

> In suit for specific performance of agreement to sell land, as evidenced by preliminary agreement, signed by plaintiff as purchaser and defendants as vendors, and which was accompanied by plaintiff's deposit of $100 that was turned over to and accepted by defendants, plaintiff was entitled to relief prayed for where the agreement was sufficiently clear, definite and complete to create a valid contract and a mutual right to specific performance.

9. VENDOR AND PURCHASER—SPECIFIC PERFORMANCE—COMPETENCY TO EXECUTE LAND CONTRACT.

> Vendor under contract to sell land who was ill, addicted to the use of liquor, and in a highly nervous state at time of accepting plaintiff's offer to purchase *held*, not shown to have been incompetent to do business at time contract was executed, hence plaintiff was entitled to specific performance thereof.

Appeal from Oakland; Doty (Frank L.), J. Submitted June 9, 1944. (Docket No. 53, Calendar No. 42,653.) Decided September 11, 1944.

Bill by David L. Czeizler against Julius Radke and wife for specific performance of an agreement to sell land. Decree for plaintiff. Defendants appeal. Affirmed.

*A. Floyd Blakeslee,* for plaintiff.

*Verne C. Hampton,* for defendants.

STARR, J. On November 23, 1942, plaintiff made an offer to purchase a dwelling-house property owned by defendants in the city of Pontiac, and on the same date defendants executed an acceptance of such offer, as follows:

"Preliminary Agreement
"Pontiac, Michigan.        November 23, 1942.
"We hereby offer and agree to purchase through Leslie R. Tripp, realtor agent for the owner, the

following described property, situated in the city of Pontiac, in the county of Oakland, and State of Michigan, to-wit:

"Lot numbered 434 of Woodward Estates subdivision of the city of Pontiac, * * * subject to restrictions and easements of record; the same being improved with a dwelling known as No. 192 Bondale, including all electric, heating and plumbing fixtures, stoker, shades and curtain rods.

"And to pay therefor the sum of $5,000 upon the following terms and conditions: $100 upon the signing of this agreement, receipt of which is hereby acknowledged to apply on the purchase price, the same to be returned should proposition be rejected by owner, or prior sale, of said property; or should the title be found unmarketable, the balance to be paid as follows:

"Four hundred dollars upon execution of good and sufficient (land contract), * * * the balance to be paid in monthly instalments of not less than $50 per month, the first payment to be due one month from date of land contract;

"Said payments (to include) six per cent. interest. Deal to be closed within five days from date, abstract of title or policy of title insurance certified to date, showing marketable title has been delivered to purchaser for examination, other bills and insurance to be adjusted to date of transfer.

"Purchaser—DAVID L. CZEIZLER. * * *

"We hereby accept the above offer and agree to terms of same, and will furnish abstract of title or policy of title insurance certified to date, showing marketable title, and when conveying shall convey by:

"Abstract and Title Guaranty Company form of land contract calling for warranty deed upon completion; we further agree to pay all taxes, special and regular, in full, that are now a lien against the said property; all taxes and assessments that become due henceforth (including December, 1942 taxes, so-

called) to be paid by purchaser; possession to be given purchaser five days from date of closing deal. Upon closing deal the undersigned 'seller' hereby agrees to pay Leslie R. Tripp a real-estate commission of five per cent. of above sales price.

"JULIUS RADKE.

"ROSE RADKE."

Upon defendants' refusal to complete the sale, plaintiff began the present suit for specific performance. Defendants answered, alleging in substance that there was no consideration for their agreement to sell; that the acceptance was not the free act and deed of defendant Julius Radke because he was ill and under the influence of intoxicating liquor when he executed it; and that plaintiff was not entitled to the relief sought. The trial court decreed specific performance, and defendants appeal. This being a chancery case, we review the same *de novo*.

We shall give only a brief summary of the testimony, much of which is in conflict. Defendant Julius Radke had lived in the United States since 1910; had conducted a grocery store; owned other properties; and said that he had "done a lot of business in this country." Leslie Tripp, a real-estate agent, testified that defendant Radke telephoned him, stating that he wanted to sell his residence property, and requested Tripp to come to his home and discuss the matter; that he and his salesman, witness Voorheis, went to the Radke home; that Radke told them that his health was poor and that he was in a hurry to sell the property as he was leaving the city. Tripp further testified that Radke said, "I will sell it for five thousand with five hundred down." Tripp's testimony was corroborated by that of witness Voorheis.

Witness White, another salesman employed by Tripp, took plaintiff and his wife to the Radke home, introduced them to the Radkes, and they inspected

the property. Plaintiff then signed the above-quoted offer to purchase and gave White a check for $100 as a binder payment. White testified in part:

"I took him (plaintiff) * * * to see the property. Mr. and Mrs. Radke were there. * * * She said to show the property. Mr. Radke was there and I made him acquainted with the party (plaintiff). * * * We looked the property over. * * * Mr. Czeizler on the way back said, 'I am going to give you a deposit.' * * * I called up Mr. Tripp and asked him if he would make out the purchase agreements. * * * I picked him up at the office and we went over to Mr. Czeizler's and Mr. Czeizler and his wife signed them. * * * Mr. Czeizler had given me his check for $100. * * * I went back to the Radke's with Mr. Tripp. * * * I heard no talk that night about them not wanting to sell. When we went in, Mr. Tripp told them that we had an offer. * * * He * * * gave Mrs. Radke a copy (of plaintiff's offer) and Mr. Radke a copy and * * * read it over to them. They signed at that time. Mr. Tripp's check was given to them at that time. No complaint was made about the check. * * * I came into the office on Wednesday and there was a note saying the Radkes wanted to know if the purchaser would buy the coal and if they wanted the roomer to stay. * * * On Friday Mr. and Mrs. Radke got into a dispute. I could see at that time they didn't want to sell the property. Mr. Radke said, 'If we got the property that we wanted, it would have been O.K., but when we got there it was sold.' "

Witness Tripp further testified regarding defendants' acceptance of plaintiff's offer and their later refusal to complete the sale, in part as follows:

"Mr. White and I drove to Mr. Radke's and gave them my check for $100 and tendered the offer to him. He accepted it. He and Mrs. Radke signed the

.agreement (acceptance of plaintiff's offer).  *  *  *
There was no quibbling about signing. They made
no objection to taking my check. The next morning
*  *  *  Mr. Radke called me on the telephone stat-
ing that he was leaving the abstract (of title) at his
daughter's grocery store, and asked me if I would
object to going out there and picking it up, having it
certified for him, which I did.  *  *  *  The abstract
was examined and approved by Mr. Czeizler's at-
torney.  *  *  *  A few days after the abstract was
approved, I met Mr. and Mrs. Radke at Mr. Hamp-
ton's office at which time I tendered them the balance
of the purchase money, the down payment, in cash.
Their attorney, Mr. Hampton said, 'We will ac-
knowledge that you have made a tender of the down
payment.' Then he suggested to Mr. Radke that he
tender me my $100 check which he had received
which he did and I declined to take it.  *  *  *  Mrs.
Radke stated that they would like to get released
from the agreement, and that if Mr. Czeizler would
release them, that she would be glad to pay me my
commission for making the sale.

"They gave as their grounds for refusing to go
.through with the deal that the contract they had con-
templated buying was no longer available, and sec-
ond, that  *  *  *  the house that they owned had
been rented by their daughter to some of her em-
ployees and they couldn't move in that house, and
then further reasons that the down payment wasn't
sufficient."

Plaintiff Czeizler testified regarding his inspec-
tion of the property and his interview with the
Radkes in part as follows:

"I went out to see the property with Mr. White,
Mr. and Mrs. Radke were there.  *  *  *  I talked
with Mr. Radke. He showed us through the prop-
erty.  *  *  *
"He told me  *  *  *  if I bought the place he
could give me possession just as soon as I wanted it

and he also showed me the advantages of the place and he took me upstairs and showed me in the attic and showed me the furnace.  \*  \*  \*

"*Q.*  At that time was anything said about the coal in the bin?

"*A.*  Yes, he asked me what we would do about the coal.  I said, you estimate about how many tons you have and I will pay you at the fair market price."

Defendants admitted signing the written acceptance of plaintiff's offer, and that Tripp's check for $100 was tendered to them, but said that they refused to accept the check because their name was not spelled properly.  They stated they could not read English, and denied reading plaintiff's offer.  It appears that defendant Julius Radke was afflicted with tuberculosis and had been in a sanitarium and undergone several operations.  Defendants both testified in substance that, to relieve his pain and nervousness, he had developed the habit of drinking large quantities of intoxicating liquor and that he also took sedatives.  Julius Radke claimed that when he signed the acceptance of plaintiff's offer, he was under the influence of liquor and sedatives and did not understand what he was doing.  He testified in part:

"I was under a doctor's care in November, 1942. \*  \*  \*

"He gave me some medicine to drink after meals and some pills.  I tried everything and I couldn't get enough relief from my pains.  \*  \*  \*  I started to use the liquor.  \*  \*  \*

"Started with a pint.  Sometimes up to a quart. \*  \*  \*

"About 8:30, Mr. Tripp came  \*  \*  \*  with Mr. White and brought the papers to sign  \*  \*  \*  and they said I should sign the papers so and so.  I signed the papers.  \*  \*  \*

"He read the words and I looked the thing over, * * * I couldn't get much straight, so I said I don't know what it is except you will read it,— * * * so he did read it but what it was I don't know. * * *

"When the papers was signed, I was—got upset. * * *

"Q. You don't claim to have been drunk on that occasion * * * when you talked to Tripp the first time?

"A. I don't say I was drunk but that is what it was. * * *

"Q. Answer yes or not, Mr. Radke. Were you too drunk to know what you were doing?

"A. No."

Defendant Rose Radke testified, "Mr. Tripp told me the paper was an agreement on the place. I signed the paper and Mr. Radke signed the paper." A doctor who had attended defendant Julius Radke for several years testified in part:

"For years * * * he has had tuberculosis which we now feel is arrested. * * * Since his release from the sanitarium, I have seen him several times going back as far as 1940 and 1941 and then in November, 1942. The chief complaint seems to be extreme nervousness. * * *

"At various times * * * he was given sedatives * * * to help induce sleep because he complained he was unable to sleep and was extremely nervous. * * *

"I think both times when I saw him in November, 1942, he had been drinking rather heavy. * * *

"The impression that I got from his general attitude was that he was almost an early case of delirium tremens. That is to the extent he was very greatly agitated and he wouldn't sit and talk calmly. * * *

"I think even without a sedative that possibly his judgment— * * * certainly his reaction to situa-

tions was definitely altered by the use of alcohol. * * *

"*Q.* What dates did you see him in November, doctor? ' * * *

"*A.* Perhaps * * * around the 20th of November. * * *

"*Q.* So you wouldn't be able to testify as to what condition he was in on the 23d (the date he signed the acceptance)?

"*A.* No, not definitely on the 23d."

Witness Voorheis, the salesman who accompanied Tripp to the Radke home in the afternoon of November 23d, said that Julius Radke did not appear to be intoxicated. Witness Tripp further testified:

"I have known the defendants since 1928. I bought groceries at Mr. Radke's store. * * *

"*Q.* Did you observe at that time (November 23d) that Mr. Radke appeared to be intoxicated or under the influence of liquor?

"*A.* It never occurred to me that he might even have had a drink. He acted normal to me. * * *

"I wouldn't think that he had been drinking. Certainly not to a degree that would affect his judgment or his mental keenness."

Witness White, the salesman who showed plaintiff the property on November 23d, and who was present that evening when defendants signed the acceptance of plaintiff's offer, testified that "Mr. Radke did not appear to be intoxicated that night."

The question presented is whether or not the trial court erred in decreeing specific performance of the ageement to sell, as embodied in plaintiff's written offer to purchase and defendants' acceptance thereof. In the case of *Blanchard* v. *Railroad Co.,* 31 Mich. 43, 53 (18 Am. Rep. 142), we said:

"The jurisdiction of equity in specific performance proceeds on the supposition that the parties

have not only agreed, as between themselves, upon every material matter, but that the matters so agreed on are of such a nature, and the subjects of enforcement so delineated or indicated, either directly or by reference to something else, or so raised to view by legitimate implication, that the court can and may collect, and in their proper relations, all the essential elements, and proceed intelligently and practically in carrying into execution the very things agreed on and standing to be performed."

In 49 Am. Jur. pp. 35, 36, § 22, it is stated:

"Whenever it appears that material matters are not clear, certain and complete, but are left by the parties so obscure or undefined that the court cannot say whether or not the minds of the parties met upon all the essential particulars, or if they did, the court cannot say exactly upon what substantial terms they agreed, the case is not one for specific performance. Equity cannot make a new contract for the parties, but must enforce the contract according to its terms or not at all, the court will not make a contract for the parties or supply any material stipulation thereof."

In the case of *MacGlashan* v. *Harper,* 299 Mich. 662, 667, we said:

"Equitable relief by way of specific performance should not be granted to plaintiff unless his course of conduct relative to the transaction has been one that warrants the approval of a court of equity. *Brear* v. *Baumgartner,* 249 Mich. 633. Specific performance is a remedy of grace and not a matter of right, *Mowat* v. *Walsh,* 236 Mich. 391, and the test of whether or not it should be granted depends upon the peculiar circumstances of each case, *Waller* v. *Lieberman,* 214 Mich. 428. The granting of this equitable remedy lies within the discretion of the court. *Stecker* v. *Silverman,* 294 Mich. 422. See,

also, *Richards* v. *White,* 44 Mich. 622; *Smith* v. *Stewart,* 245 Mich. 452; and 58 C. J. p. 1078, § 336.''

See, also, *Tincknell* v. *Ward,* 285 Mich. 47; *Wolverine Packing Co.* v. *Hawley,* 251 Mich. 215; *Chatham-Trenary Land Co.* v. *Swigart,* 220 Mich. 137; *Bilansky* v. *Hogan,* 190 Mich. 463.

''The test to be applied in such cases is, Are the sellers obligated to sell and the purchaser to buy?'' *Muirhead* v. *Freimann,* 270 Mich. 181, 185.

''As the rule is generally stated, equity will decree the specific performance of a contract only in cases where there is a mutuality of obligation and of remedy.'' 49 Am. Jur. p. 47, § 34.

The situation presented in the instant case can be summarized briefly as follows: defendants wished to sell their property and, in effect, made Tripp their agent; Tripp's salesman, with defendants' approval, showed the property to plaintiff, who made a written offer of $5,000 and gave the salesman a check for $100 as a binder payment; defendants signed an acceptance of such offer, and Tripp gave them a check for the $100 which plaintiff had paid him. That defendants accepted such check is evidenced by the undisputed testimony that several days later, on the advice of their attorney, they tendered the check back to Tripp. Defendants recognized their agreement to sell when, on the day following their acceptance, they instructed Tripp to obtain the abstract of title from their daughter and have it brought down to date. They later changed their minds, refused plaintiff's tender of the balance of the down payment, and sought to avoid their agreement to sell.

We have carefully examined the agreement, consisting of plaintiff's offer and defendants' accept-

ance, hereinbefore quoted, and conclude that the essential provisions of such agreement were sufficiently clear, definite, and complete to create a valid contract and a mutual right to specific performance. Defendants' acceptance of the check for $100 constituted a valid and sufficient consideration for their agreement to sell.

Although, because of his illness and use of liquor, defendant Julius Radke was in a nervous state at the time he accepted plaintiff's offer, we are convinced that he knew and understood what he was doing. The trial court, who saw and heard the parties and their witnesses, was in a better position to judge their credibility and the weight to be accorded their testimony. After examining the record, we agree with the trial court who said in part:

"While the court is satisfied that Mr. Radke is in a highly nervous state, I cannot help but feel that he has plenty of mental capacity. He has made a success in life, much more so than the average individual. The fact he is afflicted with tuberculosis in my opinion does not make him incompetent to do business. I am also satisfied Mrs. Radke was competent to do business. * * * There was consideration. Mr. Tripp acted as the agent of the defendants in this case and the defendants had capacity to contract. * * * The agreement signed November 23, 1942, is a valid existing agreement capable of being enforced."

We conclude that plaintiff was entitled to specific performance of defendants' agreement to sell. The decree of the trial court is affirmed. Plaintiff shall recover costs of both courts.

NORTH, C. J., and WIEST, BUTZEL, BUSHNELL, SHARPE, BOYLES, and REID, JJ., concurred.