STEKETEE *v.* STEKETEE.

1. SPECIFIC PERFORMANCE—EVIDENCE.

In order that courts may specifically enforce an oral agreement to convey property, the plaintiff must establish by clear, satisfactory and convincing proof the terms of such agreement.

2. SAME—EQUITY.

In a suit for specific performance a court of equity cannot make a contract, supply a material stipulation, or make a new contract for the parties, but must enforce the contract according to its terms or not at all.

3. APPEAL AND ERROR—CHANCERY CASES—DE NOVO REVIEW—EVIDENCE.

On *de novo* review of a chancery case, the Supreme Court is not relieved of the duty of exercising its own judgment in passing upon the evidence.

4. SAME—CHANCERY CASES—CONFLICTING TESTIMONY—FINDINGS OF TRIAL COURT.

When the testimony in a chancery case is conflicting, the findings of the trial court will be upheld in the absence of a definite showing that a contrary result should have been reached.

5. SAME — PARTNERSHIP — ACCOUNTING — CONTRACT — CONDITIONS —EVIDENCE—FINDING OF COURT.

In son's suit against father to establish a partnership or joint enterprise and for an accounting of a billposting and sign painting business, evidence supported finding of trial court that defendant's offer of 25 per cent. of the net income was conditioned upon plaintiff's cessation of drinking habits and that the agreement never became effective because of plaintiff's failure to live up to his promise, hence decree dismissing bill is affirmed.

Appeal from Muskegon; Pugsley (Earl C.), J., presiding. Submitted January 8, 1947. (Docket

No. 26, Calendar No. 43,587.)    Decided April 8, 1947.    Rehearing denied May 16, 1947.

Bill by Nelis Steketee against Peter P. Steketee for specific performance of an oral contract for partnership and for an accounting.    Decree for defendant.    Plaintiff appeals.    Affirmed.

*R. Burr Cochran,* for plaintiff.

*Harrington, Waer & Cary,* for defendant.

SHARPE, J.   This is a suit to establish a partnership or joint enterprise and for an accounting. Plaintiff, Nelis Steketee, age 55 is the only son of defendant, Peter P. Steketee, age 81 years.   Both live in or near the city of Muskegon.   From about 1900 to 1910, defendant was in partnership with George M. Leonard in the billposting and sign painting business.   In 1910, this partnership was dissolved by the purchase of the Leonard interest by defendant for the sum of $5,000.   Defendant continued to operate the business as sole owner and in his own name until about 1914, when the business was conducted under the assumed name of Peter P. Steketee & Son according to a certificate of assumed name filed with the county clerk of Muskegon county.

Plaintiff graduated from high school in 1908.   He did some work in his father's shop.   Later, he accepted employment with the Columbus Billposting Company of Columbus, Ohio, and eventually was earning $40 to $50 per week until June, 1913, when he returned to Muskegon and went to work in his father's shop at a salary of $20 per week in addition to his board and lodging.   He remained with his father until July, 1943, except for a period of about six months in 1934.

It is the claim of plaintiff that while he was employed in Columbus, Ohio, his father solicited him to return to Muskegon and as an inducement for his return stated: ''You are an only son, and if you would come back and work with me and take your chances on what you are going to make until this business gets to be large, and until I pass away, you can come back'' and ''when I pass away, the business will be yours.'' To which plaintiff replied: ''That under such circumstances, he would accept.'' Plaintiff returned to work with his father with the understanding that he would start at a salary of $20 per week; and that he and his father would jointly operate the business. A year or more after plaintiff entered into the business with his father, he (plaintiff) was offered a position with a Chicago concern, but was prevailed upon to remain by his father who stated that ''the future looked bright'' and plaintiff's ''prospects for earning money were very good for the future, and eventually I (plaintiff) would be master of my own business.'' There were no papers or writings in connection with the agreements made, plaintiff relying on his father's word for the fulfillment of such contract. Plaintiff further claims that a part of the difficulties he had with his father grew out of plaintiff's use of liquor, his father having strict convictions against the use of liquor in any form, but that plaintiff's use of liquor did not in any way detract from his duties in the sign and billposting business; that from 1913 to 1943 the business has been jointly managed by plaintiff and defendant; that at times plaintiff has been intrusted with the entire management of the business; that since the death of plaintiff's mother, in 1925, there has been a stronger affiliation between defendant and plaintiff's sister and an adverse relationship between

plaintiff and defendant; that in 1929, defendant agreed to pay plaintiff 25 per cent. of the poster and sign profits in addition to his salary and $1,200 to $1,500 bonus he was then receiving; that in 1930, plaintiff's salary was $75 per week, but he received in addition $3,500; that in 1931, plaintiff's drawing account was reduced to $50 per week, but he received a bonus of $2,000; that there never had been a settlement on the 25 per cent. agreement; that the amount due plaintiff under the 25 per cent. agreement is the sum of $34,809.11; and that the business has grown and now has a valuation of approximately $200,000.

It is the claim of defendant that no agreement was made with plaintiff to give him a share in this business or to give him a bonus of 25 per cent. of the poster and sign painting profits; that after the year 1925 plaintiff kept the books for the entire business; that when plaintiff left the employ of his father on July 7, 1934, he recorded in the books the following: "Salary of Nelis Steketee  *  *  * from January 1, 1934, to July 7, 1934, at which time I left employment;" that at that time plaintiff made no claim that he had an interest in the business or for 25 per cent. of the profits since 1929; and that on January 24, 1936, plaintiff wrote to his father who was then in Florida as follows:

"It seems to me that the best thing that you can do is to come back to Muskegon and take care of your business and Fannie's business. This whole deal is getting too rotten for me. There is absolutely no use of my trying to conduct this business on an honest and fair basis because it is evident that that policy is not successful around here. *  *  * I think it would be the best thing if you would just pack up and get back here and let me out of this underhanded sort of way of conducting business."

Defendant further claims that over a period of 10 or 12 years prior to 1929, plaintiff had received a drawing account and in some years a bonus; that from 1929 to 1942 plaintiff received a drawing account and a bonus for the years 1929, 1930 and 1931; that beginning with the year 1932 no bonus was paid; and that from 1913 to 1935, plaintiff lived at the home of defendant without charge for room and board.

The trial court made the following finding of facts and law:

"The facts before discussed, and the record in addition thereto, taken as a whole do not establish a contract which this court in its discretion can enforce by specific performance for several reasons:

"(1) It is not clear when or under what conditions defendant agreed to transfer title of the business to the plaintiff. Nowhere does the record answer the question whether transfer of the real estate and assets of the business was to be made to plaintiff during the lifetime of the defendant or to pass to him upon his death through the execution of a will.

"(2) The hope and desire of the plaintiff that his father would eventually turn the property over to him in some manner does not meet the requirements of a specific contract to do so.

"(3) The attitude of the plaintiff and the freedom exercised by him during the years of his employment, to either leave or stay with the business according to his own pleasure, are not consistent with his claim that he had an enforceable contractual interest therein. Any contract mutual in its obligations, could not be expected to permit him to go in and out of the business at will whenever it suited his likes or dislikes to do so.

"(4) The court can not make and enforce a contract for the parties, or substitute the terms of a proposed equitable settlement to supply the ab-

sence of a clear and enforceable contract made by the parties themselves.''

A decree was entered dismissing plaintiff's bill of complaint from which plaintiff appeals and urges that he established a contract with defendant either as a partner or joint operator which should be specifically enforced on the death of defendant.

In order that courts may specifically enforce an oral agreement to convey property, plaintiff must establish by clear, satisfactory and convincing proof the terms of such agreement.

In *Czeizler* v. *Radke,* 309 Mich. 349, 357, we quoted with approval from *Blanchard* v. *Railroad Co.,* 31 Mich. 43 (18 Am. Rep. 142), as follows:

'' 'The jurisdiction of equity in specific performance proceeds on the supposition that the parties have not only agreed, as between themselves, upon every material matter, but that the matters so agreed on are of such a nature, and the subjects of enforcement so delineated or indicated, either directly or by reference to something else, or so raised to view by legitimate implication, that the court can and may collect, and in their proper relations, all the essential elements, and proceed intelligently and practically in carrying into execution the very things agreed on and standing to be performed.' ''

We also quoted with approval from 49 Am. Jur. pp. 35, 36, § 22, as follows:

'' 'Whenever it appears that material matters are not clear, certain and complete, but are left by the parties so obscure or undefined that the court cannot say whether or not the minds of the parties met upon all the essential particulars, or if they did, the court cannot say exactly upon what substantial terms they agreed, the case is not one for specific performance. Equity cannot make a new contract

for the parties, but must enforce the contract according to its terms or not at all; the court will not make a contract for the parties or supply any material stipulation thereof.' "

Plaintiff gave the following testimony concerning the 1913 agreement:

"*Q.* Was there any conversation as to what share you were to have in the business?

"*A.* Yes, sir. He told me he would not promise me any definite share, as far as sharing in the profits. He said if I came back, I would be given $20 per week, and we would jointly operate the business. There was no specific part of the profits of the business mentioned. At that time, we were both at a loss to know just what that business would pay and how it would work out; but he assured me as the business grew and paid more in profits, that I would receive a greater share of the profits. There was no specific amount of 25 to 50 per cent. share I was to receive; and I was satisfied with that arrangement."

In the case at bar, defendant did not testify except by deposition. The trial court, however, had the opportunity to observe plaintiff as he gave his testimony and was in a better position than we are to appraise the value of such testimony. We hear chancery cases *de novo* and are not relieved of the duty of exercising our own judgment in passing upon the evidence. We think the facts in the instant case insofar as the 1913 agreement is concerned are conflicting and come within the rule stated in *Eicholtz* v. *Grunewald*, 313 Mich. 666, 678, where it is said:

" 'When the testimony in a chancery case is conflicting, the findings of the trial court will be upheld in the absence of a definite showing that a contrary

result should have been reached.' *Lau* v. *Lau* (syllabus), 304 Mich. 218.''

Plaintiff urges that in the year 1929, he and his father made a further agreement whereby plaintiff was to receive 25 per cent. of the profits in addition to his salary and bonus.

The record shows that in 1929 plaintiff was dissatisfied and threatened to leave the employ of his father. Whereupon, defendant in an effort to satisfy him made the following offer in writing:

''Beginning January 1, 1929, will give Nelis each year ending December 30, 25 per cent. of the net income from the posting-painting-bulletins-electric signs. This in addition to the $1,200 or $1,500 bonus and salary now receiving. This will continue so long as he stays with me.''

Defendant urges that the above offer was made with and accepted by plaintiff with the distinct understanding that plaintiff would cease his drinking habits; and that if he failed to do so or, resumed his drinking habits the agreement would automatically be cancelled, but that the agreement never became effective because of plaintiff's failure to live up to his promise.

The record shows that plaintiff did not discontinue the use of alcoholic liquors; and that plaintiff has at no time received 25 per cent. of the profits in any year. In discussing this question the trial court made the following observations:

''When plaintiff left the business in June, 1934, he did so voluntarily, and testified that it was partially on account of his health and partially because of his disagreements with his father. He further testified that he did not know when he left whether he would return to the business, although he hoped to do so. Upon his return in January, 1935, he

made no claim that there was anything due and unpaid him under the 1929 agreement. There was nothing said about it at that time. In fact, he says he went to 'take up where he left off and forget.' When he left again and for the last time in July, 1943, he made no claim that there was anything due and unpaid to him under the 1929 agreement and as he testified, there had been a separate agreement and settlement at the end of each year. He further admitted that in none of his talks or arguments with his father before the commencement of this suit did he at any time make any claims that he at any time made any claims that he had anything coming to him or that he would later expect to collect more than had been paid him in accordance with their settlements at the end of each year.''

These observations find support in the testimony given by plaintiff:

''When I came back in 1935 I had a conference with my father about my working arrangements at that time. The conference didn't take three minutes when we got together. He said to me, 'Do you feel like taking up where you left off: going on and forgetting our little difference?' I said, 'That is satisfactory with me.' That just about ended the talk. I don't think there was any more said than that. I doubt that it took three minutes.
*  *  *

''The Court: Q. When you went back again in 1935, it was after another conference with him and a patching-up, so to speak, of the differences you had previously had?

''A. That is right.

''Q. At that time, was there anything said about the unpaid bonuses on this 25 per cent. basis that he still owed you?

''A. There was not. The agreement was made in about three minutes. The question was should we take up where we left off and forget. That is the basis I went back on.

"*Q.* At the time you went back was there anything said by you to your father or by him to you as to what would be the disposition of the business in the event of his death?

"*A.* No, sir; not at that time."

The trial court found as a fact that defendant's version of the 1929 offer of 25 per cent. of the profits was the correct version. There is competent evidence in the record to support such a finding of fact. In such cases we do not reverse unless the evidence preponderates in the opposite direction. Having studied and read the record carefully, we are unable to conclude that the trial court erred in his conclusion on this question.

The decree of the trial court is affirmed, with costs to defendant.

CARR, C. J., and BUTZEL, BUSHNELL, BOYLES, REID, and NORTH, JJ., concurred with SHARPE, J.

DETHMERS, J., concurred in the result.