McDONALD *v.* SCHEIFLER.

1. APPEAL AND ERROR—CHANCERY CASES—DE NOVO REVIEW—CREDIBILITY OF WITNESSES—WEIGHT OF EVIDENCE.
   While a trial court is ordinarily in a better position to determine the credibility of, and weight to be accorded to, testimony of witnesses, in chancery cases the Supreme Court is not relieved of the responsibility of reviewing all the evidence and coming to its own conclusion as to what should be done in each cause.

2. SAME—CHANCERY CASES—FINDING OF FACT BY SUPREME COURT.
   In making a finding of fact on *de novo* review of a chancery case the Supreme Court must view the testimony of witnesses with great caution, scrutinize it closely and weigh and test it in the light of all circumstances disclosed by the record.

3. SAME—CONTRACTS—SPECIFIC PERFORMANCE.
   Where the Supreme Court finds the existence of a contract, it has the power to decree specific performance thereof, if it meets certain tests.

---

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 3 Am. Jur., Appeal and Error, § 912.
[3] 3 Am. Jur., Appeal and Error, § 1207.
[4] 49 Am. Jur., Specific Performance, § 22.
[5] 49 Am. Jur., Statute of Frauds, §§ 419, 421.
[6] 49 Am. Jur., Specific Performance, § 41.
[6] Doctrine of part performance in suits for specific performance of parol contract to convey real property.  101 A.L.R. 923.

4. SPECIFIC PERFORMANCE—EQUITY—JURISDICTION.

The jurisdiction of equity in specific performance proceeds on the supposition that the parties have not only agreed, as between themselves, upon every material matter, but that the matters so agreed on are of such a nature, and the subjects of enforcement so delineated or indicated, either directly or by reference to something else, or so raised to view by legitimate implication, that the court can and may collect, and in their proper relations, all the essential elements, and proceed intelligently and practically in carrying into execution the very things agreed on and standing to be performed.

5. FRAUDS, STATUTE OF—PERFORMANCE BY ONE PARTY—EQUITY.

If one party to an oral contract, in reliance thereupon, has performed his obligation thereunder so that it would be a fraud upon him to allow the other party to repudiate the contract by interposing the statute of frauds, equity will regard the contract as removed from the operation of the statute (3 Comp. Laws 1929, § 13413).

6. SPECIFIC PERFORMANCE—ORAL CONTRACT—PERFORMANCE.

Under record showing that plaintiff and decedent, bachelors, entered into an oral contract whereby plaintiff was to perform certain labor in the construction of a home for both parties, that plaintiff was to become its owner upon the death of the decedent and plaintiff fully performed his part of the agreement, he is entitled to specific performance of such contract in suit against the personal representatives of the decedent's estate.

Appeal from Jackson; Boardman (Harry D.), J. Submitted October 7, 1948. (Docket No. 40, Calendar No. 44,155.) Decided November 12, 1948.

Bill by Albert McDonald against Ola Scheifler, administratrix of the estate of Daniel J. Miller, deceased, for specific performance of oral contract that plaintiff was to be owner of lands upon death of defendant's decedent. Decree for defendant. Plaintiff appeals. Reversed and decree entered for plaintiff.

*Haskell L. Nichols*, for plaintiff.

*James J. Noon,* for defendant.

Sharpe, J.   Plaintiff filed a bill for specific performance of an oral agreement and alleges that he and Daniel J. Miller had been friends for many years; that in August, 1927, Miller was the owner of a lot at Wolf lake and agreed with plaintiff that if plaintiff would construct a cottage or home thereon, it would be a home for both of them and would become the property of plaintiff after the death of Miller; that plaintiff constructed the cottage, while Miller furnished the money to purchase the materials; that the cottage was constructed and the parties lived therein until 1939 when plaintiff married and moved elsewhere; that there is no public record to show that plaintiff has any right, title or interest in the property; that an administratrix has been appointed to administer the assets of Miller's estate and has threatened to sell the property.

Defendant filed an answer and denies that there was any verbal agreement as alleged by plaintiff and denies that plaintiff has any interest in and to the property in dispute.

Plaintiff urges that he has fully performed his part of the contract and offered the following evidence in support of his claim:

Louis Lammers testified:

"That he knew Daniel J. Miller, now deceased, and Albert McDonald, plaintiff.   That Mr. Miller had bought a lot at Wolf lake and one evening the first part of August, 1927, Daniel J. Miller said to McDonald: 'I will furnish the money if you put up the cottage,' he says, 'and then we will both have a place to stay, and, when I die,' he says, 'the place belongs to you.'   That also present were Lawrence Noon and James Kern."

He was asked what McDonald was to do and stated:

"He was to do the work and erect the building for his share, and then Miller said he would furnish the money. He was working in Toledo at the time and they were both bachelors, and he says, 'We will both have a place to stay.' And he says, 'When I die, why, the building belongs to you,' or 'the place belongs to you.'"

Lawrence Noon testified:

"The conversation was—they decided—Danny said he had a little money; had enough money to furnish material for this cottage if Mr. McDonald would furnish the labor and construction; and he said, 'In that way we would both have a decent home instead of living here at the boathouse.'

"Q. Was there anything said about what was to ultimately become of the home?

"A. The home was to go to Mr. McDonald at the death of Mr. Miller.

"This conversation took place before the cottage was started. McDonald agreed to it. Figured it would be a very good idea. He could do the work; Miller furnished the money. I was there when the construction started. He dug out the basement. Him and I built the blocks. It is a cement block cellar. We dug it out. We built the block form and dug out the basement. We were not paid for that. Miller bought the blocks. I was there for two weeks. Miller said: 'We will both have a dandy home,' and he says: 'When—I am quite a bit older than you—when I die, the home is yours.' McDonald built the cottage. Others helped, yes. I am single. I went up there summers. He came down to Ohio; that is Miller. I would buy groceries in Napoleon and take them to the cottage."

Forrest A. Henry testified:

"Q. That was after this cottage was built?

"A. Yes; three years after it was built.

"Q. What was said, if anything, about the cottage at that time?

"*A*. Well, he was very proud of it. It was a new cottage, and he gave me the story of how he happened to have it.

"*Q*. What did he say to you?

"*A*. Well, he told me it was Dingy. When he said 'Dingy,' I mean Mr. McDonald.

"*Q*. The plaintiff here?

"*A*. Yes, that's right. He said, 'Dingy built it.' And I have heard him tell the story many times.

"*Q*. Will you tell us what that is, please?

"*A*. Well, he said, 'Dingy built this cottage, and when I get through with it it is Dingy's cottage.'

\* \* \*

"*Q*. And what did he say all those 25 times?

"*A*. He said, 'When I am through with this cottage,' he said, 'Dingy gets it, and that is Mr. McDonald.'

"*Q*. Did he say why he was to have it?

"*A*. Because Dingy built it, yes."

David C. Ray testified:

"*A*. Well, Mr. Miller told me—well, I have heard it at least 100 times—and Mr. McDonald built the cottage and he was to have it at his death. He furnished the material."

He also testified that he did not become acquainted with Mr. Miller until 1930, and they played cards.

Ralph W. Lammers testified:

"*A*. Well, we went to town from the sale, and he was bothered with his back at that time, and I think he bought one of these pads like they put on the back, stopped at the drug store, and then we stopped and got a bite to eat; and when we was walking back to the car, why, we happened to walk by a place where they make keys, and he said, 'Just a minute. I'm going in here.' And so he went in there, and when he got back in the car, why, he handed me the key and he said, 'Now, here, this is a key to the cottage, and you keep that and don't give it to nobody.' And he

said, 'Any time you or any of your friends want to come up there they can come.' And he says, 'You will have a place as long as you live, and after I am gone Dingy gets the cottage.'"

Eileen Waltner Berry, called on behalf of defendant, testified:

"I am the daughter of Mrs. Waltner. At this time I live at Wolf lake.

"*Q.* Can you tell the court something about the care of your mother toward Mr. Miller?

"*A.* Well, yes, I think I am in a position to know. She has taken care of him off and on ever since I can remember. At different times when he didn't have work or no place to stay he always made our home his home, and he was always welcome.

"*Q.* Without charge?

"*A.* Without charge, yes, sir.

"In the last 2 or 3 years he was living he wasn't well, and my mother rubbed his back and bathed him, washed his clothes, took care of him in general; cooked his meals. He used to get quite a lot of food from Mrs. Bugg. She would give him things left over from dinners and he would fix it for himself for morning and eat later at my mother's. Two or 3 months before he passed away we were talking and he said, 'Well, he always intended that Mr. McDonald—'Dingy'—as he called him—should have his place; but he said that since he had married he didn't care for his wife and he had changed his mind; and that's all he ever said to me."

In support of her theory, defendant produced as a witness one Wilton S. Phillips who testified:

"*Q.* Do you recall, Mr. Phillips, in the year 1946 and not so long before the death of Daniel J. Miller having a talk with him at his home at Wolf lake?

"*A.* Yes, but it was while he was visiting my home in Toledo. He was to a funeral with his sister and niece at Lima, Ohio and they dropped in at my house on the way back.

"This was March 23, 1946. I asked Danny how he was feeling and he said he wasn't feeling very well; was kind of despondent. He further said Zoan was taking care of him.

"*Q.* That is his sister?

"*A.* That is his sister, yes. 'Zoan is taking care of me and she is feeding me and washing my clothes and taking care of me, and I promised her everything I have got for doing it.' "

Mildred Pliska testified:

"I heard Mr. Miller tell my mother as we were getting ready to leave in the car, he came up and he said, 'As long as Danny—Mr. McDonald was putting in the masonry he would always have a home or place to stay as long as he lived."

Madge Hartman testified:

"Did Mr. Miller ever talk with you about property matters, what he proposed to do?

"*A.* Yes, he did, quite a few times; but about a week before he went to the hospital he said—we were sitting in the yard at his sister's. Mrs. Waltner and Mr. Miller and I were sitting there, and he said that he wouldn't be so hard up if some people that owe him paid him what they owed him. And he said, 'I've got my shanty down there; not a dollar against it, nor nobody has a dollar in it.'

"*Q.* He did make that statement, did he?

"*A.* Yes.

"Then he said, 'Zoany—' that is his sister—'Zoany is going to get it when I am through with it.'

"*Q.* That is Mrs. Waltner?

"*A.* Yes."

The trial court entered a decree dismissing plaintiff's bill of complaint and in an opinion stated as follows:

"From a consideration of all the surrounding facts and circumstances in this case, as disclosed by the

proofs, the court is of the opinion that the most that can be said for the plaintiff's position in this matter is that here were 2 parties, both bachelors, unrelated, one of whom had some money to buy materials, and the other of whom had some of the necessary skill to build a cottage to be occupied by both of them. They both needed a home to live in and, in fact, had one until 1939. The undertaking was, according to the court's view of the matter, that both of them were to have a home to live in as long as defendant's decedent lived, coupled with a possible intention on the part of defendant's decedent at some future time to make a will devising the property to the plaintiff. This intention was never executed by the deceased. Circumstances subsequently developing, caused the deceased to change his mind about making a will leaving the property to the plaintiff. Under such circumstances and the principles of law applicable thereto, as hereinabove cited, the court is of the opinion that the plaintiff is not entitled to specific performance as prayed for. He may have a remedy at law, but, if so, this court may not consider such in this form of action."

Plaintiff appeals. The principal question in this case relates to the terms of the agreement made between plaintiff and Miller. Plaintiff urges that he was to build the house and upon the death of Miller, the property was to become the sole property of plaintiff; and that he has fully performed his part of the agreement. It is admitted that an agreement was made in 1927 and as a result of that agreement a house was built and that plaintiff performed a good share of the labor in its construction. There is competent evidence from which a finding of fact could be made that plaintiff and Miller were to live in the new house and that upon the death of Miller the property was to become the property of plaintiff. There is also evidence that after plaintiff married in 1939, Miller relied

upon his sister Mrs. Waltner to look after him and that shortly before his death he stated that he had changed his mind about leaving the place to plaintiff and was going to make a will and leave his property to his sister Mrs. Waltner. He did not carry out his latter intention by the making of a will.

We have repeatedly said that the trial judge who sees and hears the parties and their witnesses is ordinarily in a better position to determine the credibility of, and the weight to be accorded, their testimony than we who read the record and do not see the witnesses, but in chancery cases we are not relieved of the responsibility of reviewing all the evidence and coming to our own conclusion as to what should be done in each cause. In doing so we are not unmindful that the testimony of witnesses must be viewed with great caution, scrutinized closely, and weighed and tested in the light of all circumstances disclosed by the record, see *Kerns* v. *Kerns,* 303 Mich. 23, and where we find the existence of a contract we have the power to decree specific performance of it if it meets certain tests. The test of specific performance seems to be laid down by the Court in *Steketee* v. *Steketee,* 317 Mich. 100, 105, where it is stated:

"In *Czeizler* v. *Radke,* 309 Mich. 349, 357, we quoted with approval from *Blanchard* v. *Railroad Co.,* 31 Mich. 43 (18 Am. Rep. 142), as follows:

" ' "The jurisdiction of equity in specific performance proceeds on the supposition that the parties have not only agreed, as between themselves, upon every material matter, but that the matters so agreed on are of such a nature, and the subjects of enforcement so delineated or indicated, either directly or by reference to something else, or so raised to view by legitimate implication, that the court can and may collect, and in their proper relations, all the essential elements, and proceed intelligently and

practically in carrying into execution the very things agreed on and standing to be performed."''"

In *Guzorek* v. *Williams,* 300 Mich. 633, 638, we stated:

"If one party to an oral contract, in reliance upon the contract, has performed his obligation thereunder so that it would be a fraud upon him to allow the other party to repudiate the contract, by interposing the statute,* equity will regard the contract as removed from the operation of the statute."

In *Kendzierski* v. *Kendzierski,* 293 Mich. 701, 705, we said:

"As an abstract proposition it is true that courts will not specifically enforce an oral agreement, unaccompanied by other controlling circumstances, to make a will by means of which an interest in real estate passes. *King* v. *Luyckx,* 280 Mich. 117. But in this jurisdiction the cases are too numerous to require citation wherein it is held that an oral contract of the character herein alleged by plaintiffs to convey real property which contract has been fully executed by the expectant grantees will on their application be specifically performed by the courts."

See, also, *Briggs* v. *Briggs,* 113 Mich. 371.

The record is convincing that plaintiff and Miller entered into an agreement as contended for by plaintiff. The agreement provided that plaintiff was to perform certain labor in the construction of a home for both parties; and that plaintiff was to become its owner upon the death of Miller. Plaintiff having performed his part of the agreement is now entitled to specific performance. To permit the representatives of the estate of Miller to repudiate the contract would be unjust to plaintiff, who has done all he was required to do. The fact that Miller may

---

* 3 Comp. Laws 1929, § 13413 (Stat. Ann. § 26.908).—Reporter.

have changed his mind and intended to will his property to someone else years after the agreement was made and fully performed upon the part of plaintiff is not sufficient to abrogate the contract or deny specific performance.

The decree dismissing plaintiff's bill of complaint is reversed and a decree will be entered granting specific performance to plaintiff, with costs.

Bushnell, C. J., and Boyles, Reid, North, Dethmers, Butzel, and Carr, JJ., concurred.