GENERAL TEAMSTERS UNION, LOCAL NO. 406, *v.*
UPTOWN CLEANERS & HATTERS, INC.

1. Appeal and Error—Chancery Cases—De Novo Hearing.
   The Supreme Court hears chancery appeals *de novo* on the record,
   but gives great weight to findings of fact of the trial court.

2. Labor Relations—Employer Interference with Self-Organiza-
   tion of Employees—Collective Bargaining.
   Findings of circuit judge that termination of authority of plain-
   tiff union to represent defendant's 9 driver-salesmen as their
   collective-bargaining agent had been obtained as a result of
   interference by the defendant in the exercise by the employees
   of their right of self-organization for the purpose of collective
   bargaining and was, therefore, ineffective to terminate such
   authority of plaintiff *held*, justified under record presented
   (CL 1948 and CLS 1956, § 423.1 *et seq.*).

3. Same—Unfair Labor Practices—Defection of Union Members
   —Collective Bargaining.
   An employer cannot justify its refusal to bargain with a union
   by the defection of union members which had been induced by
   unfair labor practices, where union representation had been
   obtained by the free will of the employees (CL 1948 and CLS
   1956, § 423.1 *et seq.*).

4. Same—Collective Bargaining by Employers—Construction of
   Statute.
   The State labor mediation act, while it does not in specific lan-
   guage impose a duty on an employer to engage in collective

---

References for Points in Headnotes
[1] 3 Am Jur, Appeal and Error § 912.
[2] 31 Am Jur, Labor § 269.
[3] 31 Am Jur, Labor § 90 *et seq.*
[4] 31 Am Jur, Labor §§ 123, 263.
[5] 31 Am Jur, Labor § 247.
[9] 31 Am Jur, Labor § 124.
[10] 31 Am Jur, Labor § 92 *et seq.*
[12] 31 Am Jur, Labor § 123 *et seq.*
[13] 3 Am Jur, Appeal and Error § 912.

bargaining, does prohibit the employer from interfering with his employees' right to organize and bargain collectively and, thereby, prohibits the employer from refusing so to bargain (CL 1948 and CLS 1956, § 423.1 *et seq.*).

5. SAME—CONSTRUCTION OF STATUTES—LABOR MEDIATION ACT—SELF-ORGANIZATION OF EMPLOYEES—COLLECTIVE BARGAINING.

The State labor mediation act is construed as restating the right of employees to self-organization for the purpose of collective bargaining with their employer and, where lawful bargaining representatives have been chosen in the method provided by statute, it is unlawful for the employer to interfere with his employees in the exercise of their right to self-organization (CL 1948 and CLS 1956, §§ 423.1, 423.8, 423.16).

6. SAME—LABOR MEDIATION ACT—COLLECTIVE BARGAINING.

Compulsory collective bargaining is a part of the express provisions of the State labor mediation act (CL 1948 and CLS 1956, §§ 423.9, 423.10).

7. SAME—LABOR MEDIATION ACT—COLLECTIVE BARGAINING.

Labor mediation, as spelled out under the State labor mediation act, is a form of collective bargaining with the influence of a third party added (CL 1948 and CLS 1956, § 423.1 *et seq.*).

8. SAME—LABOR MEDIATION ACT—COLLECTIVE BARGAINING.

The purpose of the State labor mediation act was the prevention or prompt settlement of labor disputes and the preventing of strikes or lockouts and to encourage collective bargaining (CL 1948 and CLS 1956, § 423.1 *et seq.*).

9. SAME—MEDIATION—COLLECTIVE BARGAINING—QUESTIONS REVIEWABLE.

Whether or not the State labor mediation act imposes an enforceable duty to bargain collectively at any point prior to mediation *held,* not necessary to be decided in suit against employer by union, which had at one time been lawfully selected by the employees as their bargaining agent, to compel defendant employer to cease interference with the emloyees' rights to self-organization (CL 1948 and CLS 1956, § 423.1 *et seq.*).

10. SAME—COLLECTIVE BARGAINING—UNION AS BARGAINING AGENT.

Defendant employer *held,* bound by its agreement with plaintiff union to bargain collectively with it as bargaining agent of defendant dry cleaner's driver-salesmen, under record presented, showing it had been selected by the employees as such agent pursuant to an election held under the State labor mediation act (CL 1948 and CLS 1956, § 423.1 *et seq.*).

11. Same—Collective Bargaining Agreement—Labor Mediation Act.

Collective bargaining agreement between defendant employer and union, as representative of driver-salesmen of defendant dry cleaner, and which had been selected at an election conducted through machinery provided by the State labor mediation board *held*, entirely consistent with the language and purposes of the State labor mediation act (CLS 1956, § 423.9c; CL 1948, § 423.9e).

12. Same—Enforcement of Collective Bargaining Agreement—Statutes.

Enforcement of a collective bargaining agreement between defendant employer, a dry cleaner, and plaintiff union, as representative of defendant's driver-salesmen, by way of bill to enjoin defendant's unlawful interference with the employee's rights of self-organization within the meaning of the State labor mediation act is specifically authorized by the act (CLS 1956, § 423.22).

13. Appeal and Error—Chancery Cases—Reasons for Result.

The Supreme Court does not reverse a decree in equity when the court below arrived at a correct result for other reasons than those upon which the Supreme Court relies.

14. Same—Questions Reviewable—Constitutional Law—Statutes—Labor Mediation Act.

Whether or not State labor mediation act is unconstitutionally vague and indefinite to the extent that it makes refusal of an employer to bargain collectively with his employees a crime is not determined, where no criminal charges are under consideration and in view of the severability statute (CL 1948 and CLS 1956, §§ 8.5, 423.1 *et seq.*).

15. Labor Relations—Antidiscrimination—Collective Bargaining—Continuing Power of trial Court.

Plaintiff union's claim that decree enjoining defendant employer, a dry cleaner, from interfering with, restraining or coercing its employees in the exercise of their right to self-organization or contributing to or forming any labor organization and requiring defendant to bargain collectively in good faith through plaintiff, their freely chosen representative, over the wages, hours and working conditions of defendants' employees who are driver-salesmen, should also have contained an anti-discrimination provision *held*, without merit, continuing power being retained by the trial court to restrain discriminatory

practices, if need therefor be shown (CL 1948 and CLS 1956, § 423.1 *et seq.*).

DETHMERS, C. J., and CARR and KELLY, JJ., dissenting.

Appeal from Kent; Searl (Fred N.), J. Submitted April 15, 1958. (Docket No. 58, Calendar No. 47,430.) Decided June 5, 1959.

Bill by General Teamsters Union, Local No. 406, against Uptown Cleaners & Hatters, Inc., a Michigan corporation, Michael P. Salhaney and others to enforce upon employer the duty of collective bargaining and to enjoin certain violations of labor mediation act. Decree for plaintiff. Defendants appeal. Plaintiff cross-appeals seeking specific injunction against future discriminatory acts relative to union membership. Affirmed.

*Morse & Kleiner* (*A. Robert Kleiner,* of counsel) and *Padway, Goldberg & Previant,* for plaintiff.

*Warner, Norcross & Judd* (*Harold S. Sawyer,* of counsel) and *Varnum, Riddering, Wierengo & Christenson* (*Clifford C. Christenson and Eugene Alkema,* of counsel), for defendants.

*Amici curiae:*

*Harold A. Cranefield, Kurt L. Hanslowe, Redmond H. Roche, Jr.,* and *Gordon A. Gregory,* for International Union, UAW.

*Beaumont, Smith & Harris, Frank E. Cooper* and *Dwight H. Vincent,* for Michigan Manufacturers' Association.

Edwards, J. We believe the issues presented by this record are:

(1) Is plaintiff the representative of a majority of the 9 driver-salesmen employed by defendants?

(2) Did the chancellor have power, under the agreement between the parties and the terms of the labor mediation act (CL 1948 and CLS 1956, § 423.1 *et seq.* [Stat Ann 1950 Rev § 17.454(1) *et seq.*]), to require defendants to enter into collective bargaining with plaintiff?

Certain features of this case make our task somewhat easier than it might otherwise be. First, we have here a purely intrastate problem with no question of pre-emption of the field by Federal labor legislation. Second, although we deal with a dispute of some bitterness, the record discloses no strike, stoppage of work, or counterclaim of unlawful labor activity. Third, the parties are in reasonable agreement as to the issues and have filed excellent briefs. And fourth, the circuit judge who heard this chancery action wrote a careful and thorough opinion of which we shall make frequent use.

The employer defendant in this case is a dry cleaning company in the city of Grand Rapids, which employs approximately 75 persons. The business is owned and operated by Michael, Nicholas and James Salhaney, and has been so operated for over 20 years. Included among the defendants' employees are 9 men who are described as driver-salesmen.

Functions of driver-salesmen include soliciting business for the firm and picking up laundry and cleaning throughout the city, and bringing such materials to the plant where the goods are cleaned, pressed and laundered. After delivering the articles to the customers, the driver-salesmen collect the amount due or allow the customer to charge the amount. Some of the charge accounts are carried directly by the employer. Most accounts, however,

are ones of the cash-and-carry variety. In relation to these, where a driver-salesman allows a customer to charge an item where the customer is not a firm charge account, the company rules required the driver-salesman to pay the firm for such charge accounts after 30 days have elapsed. Other than these accounts, driver-salesmen turn in all money at the end of each workday. Testimony indicated that the aforementioned 30-day accounts were in actuality not always brought up to date at the end of 30 days and that the defendant firm allowed driver-salesmen some leeway as to clearing up such accounts.

This record does not disclose any record of union organization at Uptown prior to 1957. On February 5, 1957, a representative of Teamsters Union Local 406, who was a personal friend of at least 1 of the driver-salesmen, met with 6 of the 9 drivers to talk about the union. At this meeting the 6 men present signed cards joining the union, and authorizing Local 406 to represent the men in obtaining a contract with defendant firm.

The following day the 3 other driver-salesmen, upon being informed of what transpired the previous night, also signed similar cards.

Pursuant to such authorizations, representatives of Local 406 approached defendant firm's officers, Nicholas and Michael Salhaney, seeking to set a time for the purpose of negotiating a contract. Nick Salhaney expressed great surprise that his men had joined a union, and asked for time to think about the matter.

The union representatives returned the following day, at which time Nick Salhaney expressed disbelief that his men had joined a union. Possibilities of a representation election were discussed.

The next day, after consulting with his attorney, Nick made arrangements for a representation election to be held February 15, 1957, under the auspices

of the State labor mediation board. A formal mediation board agreement was executed by the parties calling for a secret ballot among the drivers "to determine the representative, if any, desired by them for the purposes of collective bargaining."

Prior to the election Nick spoke to his drivers, expressing his disappointment that the drivers wanted a union, because, he said, their problems had always been solved amicably. Prior to the election defendant firm also sent letters to the driver-salesmen instructing them as to the manner of the election. In this letter, disappointment over the desire for a union was again expressed. In addition, the letter noted:

(1) Union members pay $60 per year dues.

"What can the union do for you for this $60 or more a year that you cannot do for yourself?";

(2) The possibilities of strikes;

(3) The congressional investigation of the Teamsters Union;

(4) The high driver commission rate paid by Uptown.

The election was held as scheduled, with a resulting vote of 6–3 in favor of Local 406 being exclusive representative for collective bargaining.

On the day of the election after the results were known, Nick Salhaney had all drivers bring their 30-day accounts up to date. There is some dispute in the testimony on this matter, but it appears that the accounts generally were not handled by Nick Salhaney and that the drivers had not generally been required to keep them up to date.

Between February 15 and March 1, 1957, friction mounted between the drivers and the Salhaneys. Mike Salhaney reproached 1 driver over the union, used abusive language to him, and threatened him with violence. Reports were circulated among the drivers that defendant firm was going to go on a cash-

and-carry basis, that some drivers would lose their jobs, and that strikes would injure the drivers.

One driver spoke to Nick Salhaney about quitting the union and organizing an independent union. Nick suggested that the way to solve the problem was for the drivers to sign a petition withdrawing from the union. This petition was typed in the defendants' office after suggestions as to its wording by Nick Salhaney, and circulated and signed by all 9 men. The petition was kept in the firm safe at night, to which no driver had independent access.

Testimony also indicated that Mike Salhaney encouraged the drivers to sign the petition "joining the bandwagon." One late signer testified that Salhaney asked him why he had not already signed.

When all signatures were obtained, Local 406 was notified of the drivers' withdrawal from the union, and thereafter defendants refused to recognize the local or bargain with it as representative of its driver-salesmen.

Plaintiff local thereupon brought this action claiming unlawful interference by defendants in the exercise of employees' rights to organize, and that such interference rendered the petition of withdrawal from the union inoperative. Plaintiff also sought injunctive relief to restrain defendants from interfering with plaintiff's rights to organize and from refusing to bargain.

The circuit judge who heard the matter found in his opinion that the defendants had interfered with the rights of self-organization of the employees, and that the petition dated February 26th was ineffective, because of such interference, to terminate plaintiff's authority as representative of the employees. He thereupon entered a decree containing the following provisions:

"It is ordered that the defendants, their officers and agents, shall absolutely cease and desist from:

"(a) Interfering with, restraining or coercing their employees in the exercise of their right to self-organization.

"(b) Initiating, creating, dominating, contributing to, or interfering with the formation or administration of any labor organization.

"It is further ordered that the defendants, and their officers and agents, shall enter into collective bargaining, in good faith, with the plaintiff over the wages, hours and working conditions of the defendants' employees who are driver-salesmen, until the further order of this court."

Both parties appeal, the plaintiff arguing that the decree should have contained an antidiscrimination provision, and defendants contending that the judge's finding as to interference was in error and that the collective-bargaining order was beyond the power conveyed by the labor mediation act.

We believe that the major issues presented on appeal are as stated at the outset:

(1) Is plaintiff the representative of a majority of the 9 driver-salesmen employed by defendants?

(2) Did the chancellor have power, under the agreement between the parties and the terms of the labor mediation act, to require defendants to enter into collective bargaining with plaintiff?

The chancellor summarized the facts bearing upon the representation question thus in his opinion:

"Prior to the election defendants made known their opposition to the union both at a meeting with the employees and by means of a letter sent out to each employee. In the letter, which was carefully drafted, and standing by itself would appear to have been permitted under both the constitutional and statutory free-speech rule, defendants marshaled the arguments against the union—the monthly dues, the possibility of strikes, the events then taking place before a congressional committee with respect to this particular union, the comparison of the employees'

rate of compensation with that of competing businesses in the city. Defendants emphasized their previous associations with the employees and concluded: 'Therefore, all the union can really do is to present and argue problems and we don't think either you or we need a union to do this for us.

" 'The choice is yours to make and we urge you to give the matter careful thought. Whatever you decide, be sure to vote by the secret ballot provided by the State of Michigan.'

"The result upon the secret ballot was a vote of 6 to 3 in favor of the union.

"In less than 2 weeks the 9 employees who had so voted had all signed the so-called petition terminating the union's authority—this time without a secret ballot and only after a certain amount of persuasion. What caused this apparent change of mind?

"One cannot escape the conclusion that the aggregate of the defendants' acts played an important and controlling effect. The evidence is clear that despite the election and plaintiff's [defendants'] agreement to be bound by the results, they continued to express by various means their hostility to the union. They arranged for a meeting place of the employees to discuss the possibility of an independent union and for the giving of individual notices to each employee of this meeting; they suggested that the drafting of the letter or petition was the 'American' method of terminating the authority of the union; they made changes in the form of the petition and caused it to be typed and placed for safekeeping in the company's safe. An officer of the company took active part in persuading hesitant members to sign. * * *

"Even though we accept defendants' version as to what was said and done with regard to the calling in of the past-due accounts, the possible loss of jobs, the changing to a cash-and-carry basis and the somewhat violent argument with 1 employee, we cannot disregard wholly its effect as a part of the total picture.

"Nor can we disregard wholly what was said by the employees to the union representative urging prompt negotiations to end the pressure being put upon the employees—not as proving the existence of pressure but as evidence of the state of mind of the employees. The same may be said with reference to the question asked by the employees of the union as to whether signing the petition would have any legal effect upon its authority."

In his consideration of the evidence, the trial judge relied upon the "course of conduct" rule as set forth in *National Labor Relations Board* v. *Kropp Forge Co.* (CCA), 178 F2d 822, 828, 829, certiorari denied, 340 US 810 (71 S Ct 36, 95 L ed 595):

"Therefore, in determining whether such statements and expressions constitute, or are evidence of unfair labor practice, they must be considered in connection with the positions of the parties, with the background and circumstances under which they are made, and with the general conduct of the parties. If, when so considered, such statements form a part of a general pattern or course of conduct which constitutes coercion and deprives the employees of their free choice guaranteed by section 7, such statements must still be considered as a basis for a finding of unfair labor practice. To hold otherwise would nullify the guaranty of employees' freedom of action and choice which section 7 of the act expressly provides. Congress, in enacting section 8(c) could not have intended that result."*

The circuit judge recorded his conclusion thus:

"When the employer participates in the making of the decision as to the choice or change of choice of a bargaining representative as actively as did defendants here, it may not be heard to complain because the court cannot look into the mind of each employee and determine with mathematical nicety the weight

* See 29 USCA, §§ 157, 158.—Reporter.

to be given each factor which contributed to the signing of the document which is relied upon to terminate the authority of the union.

"Defendants urge with obvious sincerity that their relations with their employees during the building of this successful business have been good and their treatment of the employees fair.

"This is not determinative of the issue. The act applies equally to good and just employers as well as to bad and unfair employers. The decision as to whether the men wish to bargain through a union is for them to make. Neither the employer nor the union can make it for them. It must be their own free choice. * * *

"I therefore find that the defendant employer interfered in the exercise by the employees of their right of self-organization for the purpose of collective bargaining; that the so-called petition bearing date February 26th was ineffective to terminate the authority of the plaintiff as the representative of the employees."

While we hear chancery appeals *de novo* on the record, we have many times stated that we give great weight to findings of fact of the chancellor.

"The trial court is our arena for the test of truth. There the contesting parties and their witnesses appear face to face in flesh and blood with weight and size and demeanor under the eye of the trial judge. He sees the averted glance, marks the hesitation, detects the note of hysteria in the voice of a witness whose words may be calculated to deceive. The cold words on a printed page show none of these essentials to the search for fact. *Donaldson* v. *Donaldson,* 134 Mich 289; *Vollrath* v. *Vollrath,* 163 Mich 301; *Cooper* v. *Cooper,* 345 Mich 44." *Hartka* v. *Hartka,* 346 Mich 453, 455.

On the principal legal issue involved, the circuit judge relied upon *Medo Photo Supply Corp.* v. *National Labor Relations Board,* 321 US 678 (64 S Ct

830, 88 L ed 1007), wherein the United States supreme court said (p 687):

"Petitioner cannot, as justification for its refusal to bargain with the union, set up the defection of union members which it had induced by unfair labor practices, even though the result was that the union no longer had the support of a majority. It cannot thus, by its own action, disestablish the union as the bargaining representative of the employees, previously designated as such of their own free will. *National Labor Relations Board* v. *Bradford Dyeing Assn.,* 310 US 318, 339, 340 (60 S Ct 918, 84 L ed 1226); *International Assn. of Machinists* v. *National Labor Relations Board,* 311 US 72, 82 (61 S Ct 83, 85 L ed 50); *cf., National Licorice Co.* v. *National Labor Relations Board,* 309 US 350, 359 (60 S Ct 569, 84 L ed 799). Petitioner's refusal to bargain under those circumstances was but an aggravation of its unfair labor practice in destroying the majority's support of the union, and was a violation of sections 8(1) and (5) of the act."[*]

We believe the record presented here fully justifies the chancellor's findings of fact and conclusions of law.

We turn now to the second issue pertaining to the validity of the chancellor's order to defendants to enter collective bargaining with plaintiff.

At the outset it should be noted that the Michigan labor mediation act does not contain in the section dealing with unlawful conduct of employers any specific language making it unlawful for an employer to fail to engage in such bargaining. *Cf.,* Labor management relations act, 1947, § 8(a)(5) (29 USCA, § 158[a][5][*]). It is plaintiff's claim (and the

---

[*] Section 8 originally was divided into numbered subsections. See 49 Stats 452, 453. Upon amendment, 61 Stats 140, 141, section 8 was expanded, alphabetical and numerical subsections being designated. Subsections (1) and (5) became, without change in content, subsections (a)(1) and (a) (5).—REPORTER.

learned chancellor agreed) that proper construction of the act resulted in imposition of such a duty as a necessary implication of the express language of the statute and as a correlative duty to the employees' right to organize and bargain collectively.

The title and the specific provisions of the statute (CL 1948 and CLS 1956, §§ 423.2, 423.8, 423.9, 423.9b, 423.10, 423.16, 423.19, 423.22 [Stat Ann 1950 Rev §§ 17.454(2), 17.454(8), 17.454(9), 17.454(10.1), 17.454(11), 17.454(17), 17.454(20), 17.454(23)]), to which we will have reason to refer are as follows:

"An act to create a board for the mediation of labor disputes, and to prescribe its powers and duties; to provide for the mediation and arbitration of labor disputes, and the holding of elections thereon; to provide methods for settlement of hospital or public utility labor disputes, including the use of special fact finding commissions, to regulate the conduct of parties to labor disputes and to require the parties to follow certain procedures; to regulate and limit the right to strike and picket; to protect the rights and privileges of employees, including the right to organize and engage in lawful concerted activities; to protect the rights and privileges of employers; to make certain acts unlawful; and to prescribe penalties for violations of the provisions of this act."

"Sec. 2. When used in this act, unless the language or context indicates otherwise: * * *

"(b) The terms 'dispute' and 'labor dispute' shall include but are not restricted to any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of employees in negotiating, fixing, maintaining or changing terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee. * * *

"(g) The term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which em-

ployees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."

"Sec. 8. It shall be lawful for employees, to organize together or to form, join or assist in labor organization, to engage in lawful concerted activities for the purpose of collective negotiation or bargaining or other mutual aid and protection, or to negotiate or bargain collectively with their employers through representatives of their own free choice."

"Sec. 9. No strike or lockout shall take place or be put into effect until and unless each of the steps have been taken and the requirements complied with as provided in this section.

"1. In the event the parties thereto are unable to settle any labor dispute, the employees or their representatives, in the case of impending strike, or the employer or his agent, in the case of an impending lockout, shall serve notice of such dispute together with a statement of the issues involved upon the board and the other party to the dispute.    *    *    *

"2. Upon receipt of such notice it shall be the duty of the board to exercise the powers herein granted to effect a settlement of such dispute by mediation between the parties. Prior to the calling of an election as provided hereinafter, it shall be the duty of each of the parties to such dispute to actively and in good faith participate in the mediation thereof. At least 1 member of the board, to be designated by the chairman, shall actively participate in the negotiations to mediate any dispute in an industry rendering a hospital or public utility service."

"Sec. 9b. It shall be the duty of both employees and employer to avoid a cessation of employment or a change in the normal operation of the business during the entire period in which the respective steps required by section 9 of this act are being taken or until a strike is authorized by an election held as provided in section 9a."

"Sec. 10. It shall be the duty of the board:

"(a) To arrange for, hold, adjourn or reconvene a conference or conferences between the disputants and/or 1 or more of their representatives;

"(b) To invite the disputants and/or their representatives to attend such conference and submit, either orally or in writing, the grievances of and differences between the disputants;

"(c) To discuss such grievances and differences with the disputants or their representatives; and

"(d) To assist in negotiating and drafting agreements for the adjustment or settlement of such grievances and differences and for the termination or avoidance, as the case may be, of the existing or threatened labor dispute."

"Sec. 16. It shall be unlawful for an employer or any officer or agent of an employer (1) to interfere with, restrain, or coerce employees in the exercise of their right to self-organization, (2) to initiate, create, dominate, contribute to, or interfere with the formation or administration of, any labor organization; (3) to discriminate in regard to hire, terms or other conditions of employment in order to encourage or discourage membership in any labor organization; (4) or encourage membership in, or initiate, create, dominate, or contribute to a company union; or (5) to discriminate against any employee because he has given testimony or instituted a proceeding under this act. Violation of this section shall be a misdemeanor and punishable as such."

"Sec. 19. This act shall be deemed an exercise of the police power of the State of Michigan for the protection of the public welfare, safety, prosperity, health and peace of the people; and all the provisions of this act shall be liberally construed for the accomplishment of said purposes."

"Sec. 22. (a)   *   *   *

"(c) The board, the attorney general, or any prosecuting attorney, on behalf of the people, or any individual or person, may pursue any appropriate legal

or equitable remedy or other relief in any circuit court having jurisdiction with respect to any act or conduct in violation of any of the provisions of this act. The existence of a criminal penalty with respect to any such act or conduct shall not be deemed to preclude appropriate equitable relief."

The chancellor who heard this matter below considered these provisions in his construction of the act as to the question of the employer's duty to bargain:

"The court must choose between these 2 possible constructions of the act. Forceful arguments are made in support of each and it cannot be said that there is an entire freedom from doubt as to the intention of the legislature upon this precise question.

"The language of the statute being susceptible of 2 constructions, the court must adopt that which is most reasonable and best suited to accomplish the objects of the statute.

"In section 1 the legislature declared as the public policy of the State that the best interests of the people are served by 'the prevention or prompt settlement of labor disputes; that strikes and lockouts and other forms of industrial strife, regardless of where the merits of the controversy lie, are forces productive ultimately of economic wastes.'

"In section 19 the legislature expressed its views as to how in cases of doubt the statute should be construed. 'This act shall be deemed an exercise of the police power of the State of Michigan for the protection of the public welfare, safety, prosperity, health and peace of the people; and all the provisions of this act shall be liberally construed for the accomplishment of said purposes.'

"In section 8 the legislature in these words spelled out the right of employees with respect to self-organization: 'It shall be lawful for employees, to organize together or to form, join or assist in labor organization, to engage in lawful concerted activities for the purpose of collective negotiation or bargain-

ing or other mutual aid and protection, or to nego-
tiate or bargain collectively with their employers
through representatives of their own free choice.'
In so providing, the legislature did not create a new
right.   [Citing *National Labor Relations Board* v.
*Jones & Laughlin Steel Corp.*, 301 US 1 (57 S Ct 615,
81 L ed 893, 108 ALR 1352).]   *   *   *

"It can be argued with considerable force that the
recognition by the Michigan legislature of this
'fundamental right' resulted without further legisla-
tive action in the correlative obligation on the part
of the employer to perform those acts which are re-
quired to give effect to that right; that it was the
intention of the legislature to not declare merely an
academic or paper right, but to effectively secure
collective bargaining as a means of curtailing labor
disputes and furthering industrial peace.   *   *   *

"Plaintiff further contends that the Michigan legis-
lature by the provisions of section 16 has in effect
made it unlawful for the employer to refuse to bar-
gain collectively and by section 22 provided a remedy
in the courts for a violation of section 16.

"By section 16 of the act as originally adopted cer-
tain conduct on the part of the employer was pro-
hibited.   In 1949 this section was amended by the
addition of the following, 'It shall be unlawful for
an employer   *   *   *   (1) to interfere with, restrain
or coerce employees in the exercise of their right to
self-organization.'

"Plaintiff contends that this language is substan-
tially equivalent to that of section 8(a)(1) of the
national labor relations act and that that provision
had been construed prior to 1949 by the national la-
bor relations board and by the Federal courts as pro-
hibiting as an unfair labor practice the refusal of
the employer to bargain collectively with the repre-
sentative of the employees. *Art Metals Construction
Co.* v. *National Labor Relations Board* (CCA, 1940),
110 F2d 148; *Medo Photo Supply Corp.* v. *National
Labor Relations Board,* 321 US 678, 684 (64 S Ct
830; 88 L ed 1007); *Franks Bros. Co.* v. *National*

*Labor Relations Board* (1943), 321 US 702 (64 S Ct 817, 88 L ed 1020).

"Section 8(a)(1) of the national act reads, 'It shall be an unfair labor practice for an employer (1) to interfere with, restrain or coerce employees in the exercise of the rights guaranteed in section 7.' Section 7 * * * is the section relating to self-organization and collective bargaining.

"Defendants urge that there are substantial differences between section 16 of the Michigan act and section 8 of the national act.

"They first point to difference in the language of subdivision 1 of each act, that the Michigan act only makes unlawful interfering with the employees in the exercise of their right 'to self-organization,' while the national act prohibits interference 'in the exercise of the rights guaranteed in section 7.' Defendants urge that section 7 of the national act states 3 separate rights—the right to organize, to engage in concerted activities and to bargain collectively.

"Counsel argue that the failure of the Michigan legislature to expressly prohibit interference with the right of collective bargaining is significant and controlling.

"I find it difficult to believe that the legislature in adopting the 1949 amendment was making such a fine distinction between the right of self-organization and the right of collective bargaining.

"In 6 ALR2d 416, 425, the editor states, 'The first phrase of section 7 declares that employees shall have the right of self-organization. The right is not propounded abstractly, however, either in the declaration of policy in section 1, or in the discussions of courts concerning it, but as incidental to the right of employees to choose representatives for collective dealings with their employer.' And at page 432, 'The right of employees to bargain collectively through representatives of their own choosing is recognized as the central right to which the right of self-organization, and of forming, joining, or assisting labor unions, is constituent.'

"When, in 1939, the Michigan legislature adopted section 8 of the statute it did not do so for the purpose of enabling the employees to self-organize for social or fraternal purposes. It was endeavoring to avoid strikes and other forms of industrial strife and to that end it was recognizing the principle of collective bargaining and the right to organize for that purpose.

"In 1949, when it amended section 16 to expressly prohibit interference with the right of self-organization, the legislature was talking about the same kind of self-organization."

Appellants on the other hand contend that the chancellor erred in this construction of the act. They claim that Michigan has rejected compulsory collective bargaining by failure of the legislature to enact a specific duty-to-bargain provision. They point out that the unlawful interference section does not in terms forbid an employer's refusal to bargain. This latter fact is certainly accurate. But we decline at this time to explore its significance for reasons which will be noted.

We do believe, however, that enforceable collective bargaining is a part of the express provisions of the labor mediation act although the particular provision is not applicable to our current facts. Thus, section 10, *supra,* makes it the duty of the board, when mediation has been invoked, to arrange conferences between the parties and to assist in negotiating the settlement of a threatened labor dispute, while section 9 specifically states "it shall be the duty of each of the parties to such dispute to actively and in good faith participate in the mediation thereof."

It may, of course, be pointed out that these provisions are referred to as mediation, rather than collective bargaining, and that the duty thus spelled out does not arise until after mediation is invoked. We

believe, however, that the mediation thus spelled out is obviously a form of collective bargaining with the influence of a third party added. No matter what word be chosen, these provisions impose an enforceable duty upon Michigan employers under the circumstances outlined of meeting with and seeking to resolve differences with lawfully-chosen representatives of their employees. Indeed, the labor mediation act can only be read as designed to mitigate strikes and lockouts and to encourage collective bargaining.

We do not find it necessary to decide whether the statute imposes an enforceable duty to bargain at any point prior to mediation under sections 9 and 10 of the act to which we have just referred.

The fourth issue presented by appellee on its appeal is as follows:

"Were appellants bound by their contract with the appellee and the State of Michigan to recognize appellee as the collective bargaining representative of the 9 driver-salesmen?"

On the facts contained in this record and as found by the chancellor we answer this question affirmatively.

The election agreement voluntarily entered into between the parties through machinery provided by the labor mediation board spelled out the purpose of the election. It was "to determine the representative, if any, desired by them [the employees] for purposes of collective bargaining." The agreement was declared by plaintiff and defendants to be "binding upon all parties." Defendants, when they sought the consent election and signed the agreement therefor, in our view undertook to abide by the results of the election and to engage in collective bargaining in the event plaintiff won.

We find this type of agreement entirely consistent with the language and purposes of the Michigan labor mediation act.  (See sections 9c, 9e.*)

The method of enforcement sought by the plaintiff and granted by the chancellor is authorized by specific terms of the act.  The statute provides in section 22, subd (c)†:

"The board, the attorney general, or any prosecuting attorney, on behalf of the people, or any individual or person, may pursue any appropriate legal or equitable remedy or other relief in any circuit court having jurisdiction with respect to any act or conduct in violation of any of the provisions of this act."

Indeed, appellants appear to concede in their brief filed in this Court that if the revocation of the bargaining agent of their employees is not valid,, the agreement is binding and enforceable upon them. For they state:

"That agreement does provide that the results of the election shall be final and binding upon the parties.  Defendants recognized this and were preparing to negotiate until all of the employees requested them not to do so.  It was only after receiving that request that they refused to bargain.

"It is defendants' position that they were bound by that agreement for a reasonable period, unless there would be evidence sufficient to give them a good-faith doubt as to plaintiff's status as the representative of a majority of the employees."

We have previously held that the chancellor was right in determining that plaintiff was the lawfully designated representative of defendants' employees at the times in question.  As we view the facts, ap-

_____

* CLS 1956, § 423.9c, CL 1948, § 423.9e (Stat Ann 1950 Rev §§ 17.454[10.2], 17.454[10.4]).—REPORTER.

† CLS 1956, § 423.22 (Stat Ann 1950 Rev § 17.454[23]).—REPORTER.

pellants were obligated by voluntary contract to recognize appellee as representative of the employees concerned for purposes of collective bargaining and the chancellor's order required them to do so.

On this point, we found our decision on the plain terms of an agreement and the applicable sections of the labor mediation act authorizing enforcement in equity. Hence, we do not discuss the interesting authorities cited by both parties pertaining to appellee's claim of a statutory implied duty to bargain.* Our affirmance thus is based on grounds other than those employed by the learned chancellor, but we do not reverse a decree in equity when the court below arrived at the correct result for other reasons. *Langschwager* v. *Pinney*, 351 Mich 473; *Ormsby* v. *Barr*, 22 Mich 80; *County of Ottawa* v. *Zwagerman*, 229 Mich 501.

No criminal charges are under consideration here. In view of the severability statute (CL 1948, § 8.5 [Stat Ann 1952 Rev § 2.216]), we find no need to pass upon appellants' claim that the act is unconstitutionally vague and indefinite to the extent that it makes refusal to bargain a crime. Nor do we consider that the cross appeal has merit. If need arises for amendment of the injunction in order to restrain discriminatory practices, the circuit judge has clearly indicated a willingness to consider amendment upon proper showing.

The decree is affirmed. Costs to appellee.

* *See Service Drivers & Helpers, Car Washers & Garage Employees Union, Teamsters Local 985, A.F.L.,* v. *Labor Mediation Board,* 342 Mich 295; *Art Metals Const. Co.* v. *National Labor Relations Board* (CCA, 1940), 110 F2d 148; *State* v. *Stodulski* (Mo), 298 SW2d 420; *Erie County Water Authority* v. *Kramer,* 208 Misc 292 (143 NYS2d 379); *Quill* v. *Eisenhower,* 5 Misc 2d 431 (113 NYS2d 887); *Trustees of Wisconsin State Federation of Labor* v. *Simplex Shoe Manfg. Co.,* 215 Wis 623 (256 NW 56).

SMITH, BLACK, VOELKER, and KAVANAGH, JJ., concurred with EDWARDS, J.

CARR, J. (*dissenting*). This controversy involves the interpretation and application of certain provisions of the labor mediation statute of Michigan, PA 1939, No 176, as amended.* It was the claim of plaintiff, as set forth in its bill of complaint, that defendants have violated said statute by improper interference with the rights of employees with reference to self-organization, and that they have wrongfully refused to engage in collective bargaining. Defendants denied the charges made against them, contending specifically that no duty rested on them to engage in collective bargaining with the plaintiff. It was their position in the trial court, and likewise on appeal, that the obligation to engage in collective bargaining, not having been specifically imposed by the statute, may not properly be implied from the language of the act, and that their conduct did not constitute prohibited interference with employees with reference to affiliation with plaintiff union, or otherwise in any attempt to obtain a bargaining agency.

Defendant corporation is, and for several years past has been, engaged in conducting a cleaning business in the city of Grand Rapids. The individual defendants are its officers in charge of its operations. Among other employees, it had at the time of the controversy in question here 9 men who were designated as driver-salesmen. Said employees were solicited to join the union and signed applications to that end. Apparently defendants did not approve such action and, in consequence, an election was held under the direction of the State mediation board, at which a majority of the 9 driver-salesmen, by secret ballot,

---

* CL 1948 and CLS 1956, § 423.1 *et seq.* (Stat Ann 1950 Rev § 17.454 [1] *et seq.*).

indicated their desire to become affiliated with the plaintiff. Shortly thereafter, however, they undertook by written notice to withdraw from such membership, and, in consequence, defendants refused to recognize plaintiff as the representative of said employees.

On the trial in circuit court it was the claim of the plaintiff that the withdrawal, or attempted withdrawal, of the driver-salesmen of defendant corporation from the union was the result of the conduct of defendants, that undue pressure was brought to bear on the driver-salesmen, that they were urged to sign the withdrawal petition, and that in the aggregate the acts of the defendants constituted improper interference with the employees in the exercise of their right of self-organization and, hence, amounted to an unfair labor practice. The trial judge concluded from the proofs before him that plaintiff had sustained the burden of proof on such issue and held, as appears from his opinion, that the right to injunctive relief against such conduct had been established. Without discussing the testimony in detail, it is sufficient to say that the record supports the holding of the circuit judge with reference to this phase of the controversy. The provision of the decree granting relief to plaintiff against improper and forbidden interference with the rights of the employees in question with reference to self-organization and the selection of a bargaining agency is affirmed.

The attempted withdrawal of the driver-salesmen from plaintiff union having resulted from improper methods of persuasion, the conclusion follows that plaintiff union is entitled to represent said employees, or at least a majority of them, in negotiations with the employer. This brings us to a consideration of the principal question at issue in the case, namely, whether the pertinent provisions of the labor mediation act of this State impose on the defendant

employer the duty to bargain with the plaintiff as the representative of the employees concerned. No claim is made that interstate commerce is in any way involved or that the provisions of the Federal labor relations act* are applicable. It is also conceded that the Michigan statute contains no specific provision imposing on an employer subject thereto the duty to engage in collective bargaining with the representative of its employees. Neither does it impose such duty on employees or their representatives.

Plaintiff relies on section 8 of the statute (CL 1948, § 423.8 [Stat Ann 1950 Rev § 17.454(8)]) which reads as follows:

"It shall be lawful for employees, to organize together or to form, join or assist in labor organization, to engage in lawful concerted activities for the purpose of collective negotiation or bargaining or other mutual aid and protection, or to negotiate or bargain collectively with their employers through representatives of their own free choice."

It is argued, in substance, that the statutory recognition of the enumerated rights on the part of employees, including the right to bargain collectively, imposes a correlative duty on employers with respect to collective bargaining. It may be noted in this regard that a declaration of the *right* to bargain on the part of employees is not equivalent to creating a duty to do so. As before suggested, defendants insist that such duty may not be thus implied, the legislature having failed to specifically declare it. The circuit judge accepted the plaintiff's interpretation of the provisions of the act and held that defendant corporation owed a statutory duty to bargain with plaintiff as the representative of a majority of the driver-salesmen. Accordingly the decree entered

---

* 29 USCA, § 141 *et seq.*, the labor management relations act of 1947, which was amendatory of the prior act of 1935.

provided for a mandatory injunction requiring defendants to engage in collective bargaining.

As indicated at the outset, the problem is one of statutory interpretation. On behalf of plaintiff attention is directed to the declaration of policy, in the first section of the mediation statute, referring to the public interest in labor disputes and declaring further that "the voluntary mediation of such disputes under the guidance and supervision of a governmental agency will tend to promote permanent industrial peace and the health, welfare, comfort and safety of the people of the State." The mediation act may properly be regarded as remedial legislation. There is no dispute in this regard, but in construing said act it must be borne in mind that it rests with the legislature to indicate the means and methods by which the purposes of the enactment are to be accomplished. Obviously the Michigan act is not of the same character as the Federal labor management relations act of 1947, or the previous act of Congress of 1935. As the circuit judge remarked in the course of his opinion:

"The Michigan legislature created a mediation board, but not a labor board."

The declaration of policy suggests that the legislature had in mind the protection of the public welfare through the adjustment of labor disputes by mediation.

There is much force to the argument of defendants that if the legislature of Michigan had intended in the enactment of the mediation act to impose on employers the duty of collective bargaining it would have done so in specific terms. It has been repeatedly declared by courts throughout the country that the primary purpose of statutory construction is to discover the legislative intent. To that end recourse must be had primarily to the language employed. In

*Ellis* v. *Boer,* 150 Mich 452, 455, the question was presented whether the legislature in amending an act providing for primary elections in Kent county and the city of Grand Rapids had abolished such elections within the city. In determining that such was the result, it was said, in part:

"From the act itself and from the legislative journals the legislative intent must be ascertained. *People, ex rel. Hart,* v. *McElroy,* 72 Mich 446 (2 LRA 609); *Attorney General* v. *Rice,* 64 Mich 385. It is clear from reading the act—and there is nothing whatever claimed to be contained in the legislative journals to the contrary—that the legislative intent was not to re-enact the provisions of the section relative to primary elections of elective city officers in the city of Grand Rapids. It is a distinct and direct amendment of the section by an orderly and constitutional legislative enactment, substituting the section as amended for the section as it stood in the law before this amendment.

"The provision not re-enacted was the only one in the entire act which authorized and fixed a primary election of city officers in Grand Rapids. It is not the province of the Court to inquire why the legislature struck such provision out of the law. It is the province of the Court to construe the legislative enactment. There is now no provision in this law for holding such primaries. The action of the council in fixing a day for holding such primary election was therefore without authority and of no force or effect."

In *City of Detroit* v. *Detroit United Railway,* 156 Mich 106, the question before the Court involved the interpretation of a statute providing for the payment of damages sustained by property owners in the making of improvements for the public benefit. In the opinion we find the follow significant comments (pp 110, 111):

"Counsel entertain widely differing opinions about the scope and effect of this legislation, for which they find reasons, in the meaning they give to the words, in the general purpose of the law and in the previous state of the law. As would be expected, these opinions favor on the one hand a liberal construction of what is denominated a 'remedial statute,' on the other hand a construction which will not expand or enlarge the meaning which the words employed will bear. Without setting out the arguments, by which we have profited, we state the conclusions we have reached and the reasons therefor. This is a remedial statute, in essence a declaration of the right of the individual to compensation for damages sustained by him for the public benefit. A rule often stated is that a remedial statute should be construed liberally for the advancement of the remedy; but neither this rule nor the one of strict construction is a warrant for disregarding the language of a statute, or for amending the law to conform to a judicial conception of what should have been the legislative conception in passing it."

The national labor relations act, as amended, provides in section 8 (29 USCA, § 158) that:

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

"(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it; *Provided,* That subject to rules and regulations made and published by the board pursuant to section 156 of this title, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay;

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any

labor organization: *Provided,* That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made and has at the time the agreement was made or within the preceding 12 months received from the board a notice of compliance with section 159(f), (g), (h) of this title, and (ii) unless following an election held as provided in section 159(e) of this title within 1 year preceding the effective date of such agreement, the board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: *Provided further,* That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

"(4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter;

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

A comparison of the provisions of the Federal act with those of the State mediation act clearly indicates that in the enactment of the latter measure consideration was given to the language of the act of Congress. Section 16 (CL 1948, § 423.16 as amended by PA 1949, No 230 [CLS 1956, § 423.16, Stat Ann 1950 Rev § 17.454(17)]) of the State statute provides as follows:

"It shall be unlawful for an employer or any officer or agent of an employer (1) to interfere with, restrain, or coerce employees in the exercise of their right to self-organization, (2) to initiate, create, dominate, contribute to, or interfere with the formation or administration of, any labor organization; (3) to discriminate in regard to hire, terms or other conditions of employment in order to encourage or discourage membership in any labor organization; (4) to encourage membership in, or initiate, create, dominate, or contribute to a company union; or (5) to discriminate against any employee because he has given testimony or instituted a proceeding under this act. Violation of this section shall be a misdemeanor and punishable as such."

It will be noted that the State statute is substantially identical with the Federal act in several respects in its provisions as to unfair labor practices on the part of an employer. There is, however, a significant omission of the requirement as to collective bargaining. In view of the similarity of the language used in the 2 acts, such omission suggests the intentional rejection by the Michigan legislature of language imposing the specific duty here in question. Had such requirement been intended, the inference may not be avoided that the State legislature would have incorporated in the mediation act the language of the Federal law or some analogous provision. Declaring the right on the part of employees to organize and to engage in collective bargaining

through their chosen representatives may not be regarded as imposing the duty in question on the employer, particularly so in view of the specific nature of the enactment in question.

With reference to the issue of interpretation the recent decision of the supreme court of Missouri in *Quinn* v. *Buchanan* (Mo), 298 SW2d 413, is of interest. The facts there involved were analogous to those in the case at bar. Plaintiffs represented a labor union to which driver-salesmen of the defendant employer belonged. It was claimed that defendant refused to enter into collective bargaining with the union as the representative of said employees. There, as here, mandatory injunctive relief was sought to compel defendant to negotiate and bargain. The action was based on a constitutional provision of the State of Missouri (art 1, § 29) declaring:

"That employees shall have the right to organize and to bargain collectively through representatives of their own choosing."

It will be noted that said provision is analogous to the section of the Michigan mediation act on which plaintiff relies in the instant case. In denying the right to the injunctive remedy sought, the court, construing the language of the constitutional provision on which the plaintiffs relied, said (pp 418, 419):

"This provision is a declaration of a fundamental right of individuals. It is self-executing to the extent that all provisions of the bill of rights are self-executing, namely: Any governmental action in violation of the declared right is void. As between individuals, because it declares a right the violation of which surely is a legal wrong, there is available every appropriate remedy to redress or prevent violation of this right. However, the constitutional provision provides for no required affirmative duties concerning this right and these remedies can only apply to

their violation. As stated in *Quill* v. *Eisenhower,* 5 Misc 2d 431, 433 (113 NYS2d 887, 889): 'It is evident that the constitutional provision guaranteeing employees the right to organize and bargain collectively through representatives of their own choosing does not cast upon all employers a correlative obligation. The constitutional provision was shaped as a shield; the union seeks to use it as a sword. * * * The constitutional provision was intended to protect employees against legislation or acts which would prevent or interfere with their organization and choice of representatives for the purpose of bargaining collectively.' Thus implementation of the right to require any affirmative duties of an employer concerning it is a matter for the legislature."

It was accordingly held that while plaintiffs were entitled to injunctive relief against defendant to restrain him from coercing employees into withdrawing from the union, they were not entitled to a mandatory injunction requiring defendant to bargain with the union. The decision in *Quill* v. *Eisenhower,* 5 Misc 2d 431 (113 NYS2d 887), cited by the Missouri court, is in accord.

Decisions of the Federal courts dealing with questions of alleged unfair labor practices under the labor management relations act, and involving specific provisions thereof, are of little assistance in the construction of the Michigan statute providing for mediation of labor disputes. Counsel have called attention to a number of cases of such character, of which *National Labor Relations Board* v. *Jones & Laughlin Steel Corp.,* 301 US 1 (57 S Ct 615, 81 L ed 893, 108 ALR 1352), is fairly typical. Among other questions there involved was the provision of the Federal act specifically declaring it to be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights recognized by the act. Specifically involved

was the right of self-organization. It was recognized
that under the law employees were entitled to act
through representatives of their own choosing. As
above indicated, a like situation exists under the
State enactment in question here, which statute does
not refer to collective bargaining. Specific reference
to other Federal cases would serve no useful purpose
in determining the issue of statutory interpretation
involved in the instant proceeding.

It may be noted, also, that the decision of this
Court in *Service Drivers & Helpers, Car Washers
& Garage Employees Union, Teamsters Local 985,
A. F. L.,* v. *Labor Mediation Board,* 342 Mich 295,
involved the right of the mediation board to refuse
to conduct an election for the purpose of determining
whether the plaintiff union represented a majority of
the employees of an employer. It appears that the
employer in question had refused to recognize the
plaintiff as the representative of such employees.
It was held that the showing made on behalf of the
plaintiff was sufficient to permit the jurisdiction of
the board to be invoked, and the language used in
the opinion, to which attention has been directed,
had reference to the right of employees to select
"representatives of their own free choice." In de-
claring that it was the duty of the defendant media-
tion board to take jurisdiction in accordance with pe-
titions filed by the plaintiff union and a majority of
the employees, it was recognized that an employer
could not defeat the jurisdiction of the board, or
the right of employees to invoke it, by refusing to
recognize the chosen representative of the employees.
Obviously the case did not involve the question pre-
sented in the instant controversy.

In determining the legislative intent in the passage
of the mediation act at the 1939 session, and in its
subsequent amendment 10 years later, we may prop-
erly look to the legislative history in each instance.

Judicial notice may be taken of the journals of the house and senate. *Wilson* v. *Atwood,* 270 Mich 317. We find from the House Journal of the session of 1939 that Bill #109, which ultimately became the mediation act, was introduced early in the session. At the time of its introduction it contained a provision (section 26 of the bill) declaring it to be unlawful for an employer "to refuse to bargain collectively." The bill passed the house and was transmitted to the senate for action thereby. In the senate there was a substituted bill which did not include the provision of the house bill, as introduced, imposing the duty to bargain collectively.

In accordance with the usual legislative practice conference committees were appointed, and a measure was agreed on thereby and adopted by both houses, the provision with reference to collective bargaining being omitted. It thus appears that the legislature in the adoption of the mediation act at the session of 1939 rejected the provision the inclusion of which would support plaintiff's claim in the instant case. It may be noted also that at the same session Senate Bill #43 was introduced on January 19, 1939, and Senate Bill #76 a few days later. Each of these bills declared it to be an unlawful labor practice for an employer to refuse to bargain collectively with the representatives of their employees. Neither measure received favorable action. The journals of the house and senate for the session of 1939 indicate beyond question that the legislature declined to accept a provision relative to collective bargaining analogous to that found in the national labor relations law.

At the session of 1949 the mediation act was amended by Act No 230 of that year. Senate Bill #236 as introduced proposed the amendment of section 16 of the mediation act, above quoted, in such way as to make it unlawful for an employer to refuse

to bargain collectively with the duly recognized representative of his employees. Other proposed amendments in the bill, if adopted, would have tended to change the Michigan statute from a mediation measure to a labor board act analogous to the Federal statute. Obviously the bill as drafted rested on the premise that the original mediation statute, passed 10 years earlier, did not impose the duty on the employer to bargain collectively. Following committee hearings conducted in both house and senate, the provisions of Senate Bill #236 were modified, and there was omitted from section 16 thereof the provision, taken in substance from the Federal act, with reference to collective bargaining.

It may be noted, also, in connection with the legislative history of the mediation act that the legislature, while refusing to accept an amendment to the mediation act requiring all employers to bargain collectively with the representatives of their employees, undertook, in section 13a of PA 1949, No 230 (CLS 1956, § 423.13a [Stat Ann 1950 Rev § 17.454 (14.2)]) to impose such obligation in labor disputes involving hospital or public utility employees. For reasons not material, based on the procedure specified in the handling of such disputes, these amendments relating to disputes of the character indicated were held invalid in *Local 170, Transport Workers Union of America* v. *Genesee Circuit Judge*, 322 Mich 332. However, the provision enacted with reference to collective bargaining in the special classes of cases mentioned must be taken to indicate that the legislature did not consider that any general obligation as to collective bargaining by employers was contemplated by the act. Any such general provision would of course have rendered it unnecessary to incorporate the special requirement as to hospital and public utilities.

The rejection by the legislature in 1939, and again in 1949, of a proposed statutory requirement imposing on employers the duty of collective bargaining leaves no question as to the legislative intent. In *Wayne County* v. *Auditor General,* 250 Mich 227, there was involved the interpretation of PA 1927, No 150, relating to the apportionment of highway funds. After indicating that the act should be construed in connection with PA 1925, No 1, it was said (pp 235, 236):

"If there is any occasion to support the conclusion here reached as to the proper statutory construction by further reasons, such reasons will be found in the following:

"(1) *Legislative History.* The legislative history of the 1927 act reveals the fact that while it was pending in the legislature, a proposed amendment was rejected which, if embodied in the act, would have rendered it subject to plaintiff's interpretation and not to that of the defendant (see House Journal, 1927, page 965). Surely this gives rise to the inference that the legislature did not intend the act should be subject to the interpretation now urged by plaintiff. 36 Cyc, p 1147, citing many cases."

The above decision was cited with approval in *People* v. *Adamowski,* 340 Mich 422, 429. In determining the matter of statutory construction involved, it was there said:

"When the legislature affirmatively rejected the statutory language which would have supported the State's present view, it thereby made its intention crystal clear. We should not, without a clear and cogent reason to the contrary, give a statute a construction which the legislature itself plainly refused to give."

For the reasons above indicated, we are not in accord with the holding of the circuit judge in the instant case as to the duty of defendant employer to

engage in collective bargaining with the plaintiff. A reading of the statute does not support the construction contended for by plaintiff, and the legislative history of the Michigan act and its amendments is conclusive on the issue of intent. We cannot read into the act a provision that the legislature expressly rejected in the original enactment of the measure and in its subsequent amendment.

As before noted, an election was held under the direction of the State mediation board for the purpose of determining if the employees of the defendants desired to be represented by plaintiff in their dealings with their employers. Apparently defendants rejected the claim that the employees had previously indicated their choice in the matter, and desired a definite expression of opinion on the subject. Precedent to the election an agreement was entered into, for the holding of the election, in accordance with the procedure of the mediation board. The result of the election as certified by the board indicated that 9 votes were cast, of which 6 favored the selection of the plaintiff and 3 were opposed. Defendants, however, refused to enter into collective bargaining with plaintiff, apparently relying on the claim that the employees did not desire such action.

On behalf of plaintiff it is asserted by counsel in their brief that the agreement for the holding of the election, which provided that the parties thereto should be bound by the result, imposed the duty of collective bargaining and that such agreement should be specifically enforced. We cannot agree with such interpretation of the written contract for the election. It contained no provision requiring either party thereto to bargain collectively. Such being the case it is not subject to specific enforcement in a court of equity. The purpose of the election was to determine whether plaintiff should act for and on behalf of the employees in dealing with problems

arising from the employment relation. Unquestionably the parties might voluntarily have carried on collective bargaining, in which event defendants could not have objected to the representation of their employees by the plaintiff. The agreement, being a part of the mediation board's customary procedure in such cases, must be construed in connection with the statute under which the board acted. For the reasons above set forth the duty of collective bargaining was not imposed by the statute, and it is equally true that the contract did not require it.

It is significant that the bill of complaint filed by plaintiff, seeking relief by way of mandatory injunction, was not based on the election agreement. Specific performance was not asked on the ground that defendants had thereby assumed a binding and irrevocable obligation to engage in collective bargaining, with plaintiff acting on behalf of the employees. While the record indicates that mention was made of such contract by counsel for plaintiff during the course of the trial in circuit court, it is apparent from the record before us that it was not urged as the basis of a decree for specific performance. The trial judge did not refer to it in his opinion. Apparently he did not consider it as involved in the determination of the case. It is a fair conclusion also that plaintiff's failure to plead the contract as a possible basis for equitable relief fully justified the finding that reliance was not placed thereon. In any event, the contention now advanced in this Court is without merit.

Specific performance of a contract may not be sought in equity in the absence of clear and specific provisions in the undertaking of the parties imposing a duty that the court may properly require to be performed, and performance of which may be, as a practical proposition, adequately supervised by the court granting such a decree. In *Blanchard* v. *De-*

*troit, L. & L. M. R. Co.,* 31 Mich 43 (18 Am Rep 142), a contract was entered into between the plaintiff and the predecessor of the defendant providing that in consideration of the conveyance of certain land to the railroad company it would construct thereon and maintain a depot or station house suitable for the convenience of the public, and that freight and passengers should be regularly taken to and from such station. In considering the situation it was said in the opinion of the Court (pp 52, 53):

"Supposing it to be admitted that the provision in the grant is susceptible of being understood in a promissory sense, and is capable of being considered as in the nature of an agreement by the defendants with the complainant, is it capable of specific enforcement by the court? Setting aside the objection founded on public policy, which is not examined, are the requirements in the writing of *such a nature, and so fully and clearly marked out, defined, identified, or indicated,* as to make specific execution by the court practicable? We had occasion in the recent case of *Buck* v. *Smith,* 29 Mich 166 (18 Am Rep 84), to submit some observations respecting the power and duty of the court to execute agreements for the performance of an indefinite number and variety of future acts within the scope of a business not distinctly and exactly mapped out and particularized, and what was there stated has some application here.

"The jurisdiction of equity in specfic performance proceeds on the supposition that the parties have not only agreed, as between themselves, upon every material matter, but that the matters so agreed on are of such a nature, and the subjects of enforcement so delineated or indicated, either directly or by reference to something else, or so raised to view by legitimate implication, that the court can and may collect, and in their proper relations, all the essential elements, and proceed intelligently and practically in carrying into execution the very things agreed on and standing to be performed.

"If, however, it appears, either that the things to be performed are in their nature incapable of execution by the court, or that needful specifications are omitted, or that material matters are left by the parties so obscure or undefined, or so in want of details, or that the subjects of the agreement are so conflicting or incongruous, that the court cannot say whether or not the minds of the parties met upon all the essential particulars, or if they did, then cannot say exactly upon what substantial terms they agreed, or trace out any practical line where their minds met, the case is not one for specific performance."

In accordance with the general conclusions indicated in the language quoted, it was held that the agreement was not one that was subject to specific performance and the decree of the trial court dismissing the bill of complaint was affirmed. The principles recognized by the Court have been repeatedly stated and followed in subsequent decisions, among which are *Diamond Lumber Co.* v. *Anderson,* 216 Mich 71; *Sword* v. *Aird,* 306 Mich 14; *Steketee* v. *Steketee,* 317 Mich 100; *McDonald* v. *Scheifler,* 323 Mich 117; *Sobczak* v. *Kotwicki,* 347 Mich 242.

Inasmuch as the contract for the holding of the election among the employees of the defendants did not by its terms impose the duty of collective bargaining it would seem to be unnecessary to emphasize the well-established rule that specific performance of a contract will not be granted in any case unless the performance decreed may be, as a practical proposition, directed and supervised by the court. The cases above cited, including *Blanchard* v. *Detroit L. & L. M. R. Co.,* recognize the general rule in this respect. See, also, *O'Melia* v. *Berghoff Brewing Corp.,* 304 Mich 471, 476 (145 ALR 679).

A provision requiring collective bargaining may not be read into the agreement here under considera-

tion.   Had it been expressly stated the situation would scarcely permit of practical supervision of the carrying out of a decree for specific performance. Obviously many matters may be involved in collective bargaining between an employer and the representative of employees.   It is true, also, that opinions may well differ as to the subjects for consideration.   Involved also is the essential element of good faith on both sides and due consideration of issues of a material nature.   Such a situation would clearly fall within the rule that:

"Specific performance is generally refused where enforcement of the contract would be difficult or inconvenient."   81 CJS, Specific Performance, § 17, p 442.

Of like import is 49 Am Jur, Specific Performance, § 70, p 85.

In support of their argument that the decree of the trial court providing for the issuance of a writ of mandatory injunction should be upheld on the theory of specific performance counsel for plaintiff cite no relevant authority.   Attention is directed to *General Magnetic Company* v. *United Electrical Radio & Machine Workers of America, Local 937, CIO*, 328 Mich 542.   The contract there involved between the plaintiff employer and the defendant union as the representative of employees prescribed certain grievance procedure and prohibited any sort of work stoppage until compliance therewith had been wholly exhausted.   It was held by this Court that the defendant had breached its contract and was, in consequence, liable for resulting damages.   The case involved the disregard of a negative covenant against work stoppages rather than the specific performance of an affirmative undertaking.   It may not be regarded as relevant to any possible issue involved in the present controversy.

It may be noted, also, that section 22 of the mediation act, as amended (CLS 1956, § 423.22 [Stat Ann 1950 Rev § 17.454(23)]), does not support the claim of right to specific performance advanced in the present case. Subdivision (c) of said section provides that:

"The board, the attorney general, or any prosecuting attorney, on behalf of the people, or any individual or person, may pursue any appropriate legal or equitable remedy or other relief in any circuit court having jurisdiction with respect to any act or conduct in violation of any of the provisions of this act. The existence of a criminal penalty with respect to any such act or conduct shall not be deemed to preclude appropriate equitable relief."

It will be noted that the language of the statute refers to "any act or conduct in violation of any of the provisions of this act." If the election contract, which plaintiff claims should be specifically enforced, had actually imposed the duty of collective bargaining, it is obvious that refusal to comply therewith would not constitute a breach of the statute. In consequence the language above quoted, designed to facilitate enforcement of the provisions of the mediation act, would have no bearing.

The practical situation presented here is that neither the statute, the Michigan mediation act, nor the agreement for the holding of an election to determine the right of plaintiff to represent defendants' employees, imposes the duty of collective bargaining. The decree of the circuit court, insofar as it authorizes the issuance of a mandatory injunction, should be vacated. Questions of statutory construction being involved, no costs are allowed.

DETHMERS, C. J., and KELLY, J., concurred with CARR, J.